FILED

SEP 1 3 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA
### 500 I Street, Sacramento, California  95814

DAWN DEVORE, Pro Se
15171 Victoria Lane
Huntington Beach, CA 92647
707-635-3644

    Plaintiff,

vs.

1. **DEPARTMENT OF JUSTICE,**
   Jefferson Sessions, Attorney General, in
   his Personal and Official Capacity;
2. **DEPARTMENT OF DEFENSE,**
   Dr. Michael Griffin, Under Secretary of
   Defense for Research and Engineering, in
   his Personal and Official Capacity;
3. **NASA AMES RESEARCH CENTER,**
   Eugene Tu, Director, in his Personal and
   Official Capacity;
4. **DEPARTMENT OF HOMELAND
   SECURITY**; Kirstjen Nielsen, Secretary,
   in her Personal and Official Capacity;
5. **FEDERAL BUREAU OF
   INVESTIGATIONS;** Christopher Wray,
   Director, in his Personal and Official
   Capacity
6. **SCREENED IMAGES, d/b/a
   CORRECTIONS.COM,"**
   Joseph Noonan and Tim Blake, Owners, in
   their Personal and Official Capacities;
7. **BINJ LABORATORIES,** Joseph
   Noonan, Tim Blake, Owners, in their
   Personal and Official Capacities;
8. **SCREENED IMAGES, d/b/a/
   "SCREENED IMAGES MULTI-
   MEDIA,"** Laura Noonan, President, in her
   Personal and Official Capacitiy;

Case No.: 2:18-CV-2487 KJM AC PS

**COMPLAINT FOR PERSONAL
INJURIES INCLUDING
42 U.S.C. § 1983:**

**NONCONSENSUAL HUMAN
EXPERIMENTATION
(CALIFORNIA HEALTH AND
SAFETY CODES §24170-24179.5);**

**INVOLUNTARY SERVITUDE; and**

**INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS**

9. **MAXAR SATELLITE TECHNOLOGIES, Owner**, in his personal capacity;
10. **CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION;** Christopher Gates, Information Analyst, in his Personal and Official Capacity;
11. **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES;** Lara Saich, Deputy Director, Risk Management Branch, in her Personal and Official Capacity; Janet Lewis, former Deputy Director, Risk Management Branch, in her Personal and Official Capacity; Christine Milne, Manager, Disability Management Unit, in her Personal and Official Capacity;
12. **CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH ADMINISTRATION,** Marie Blake, District Manager, in her Personal and Official Capacity;
13. **DUANE ESSEX**, in his Personal and Official Capacity
14. **UNKNOWN DOES 1-20;** In their Personal and Official Capacities

Defendants

## I.    INTRODUCTION AND SUMMARY OF THE COMPLAINT

1.    Proper Notice was given to State defendants on March 13, 2018,  pursuant to the California Tort Claims Act [Department of General Services Claim 18002049].  The filing of this Complaint is done to preserve Plaintiff's rights under the California Tort Claims Act and notice hereof is given pursuant to the Federal Tort Claims Act as both actions arise out of a common nucleus of operative fact.

2.      As set forth herein, the defendant government agencies have been using Plaintiff for an unwilling human subject for government-sponsored radiation research (both non-ionizing and ionizing radiation) and radiation-related cancer/disease research, to advance biomedical science, defense weapons and space exploration. Plaintiff would not have given consent had Plaintiff ever been requested, or if Plaintiff had known that such testing was going to be conducted on Plaintiff in any manner, shape or form, and the Plaintiff has been greatly damaged by such wrongful and illegal conduct perpetrated by such Defendant agencies.

3.      As a direct and proximate result of these experiments perpetrated by Defendants, Plaintiff has been severely damaged and injured, and Plaintiff's medical experts have opined that it is a certainty that Plaintiff will develop cancer in the future which would prevent Plaintiff (who has been acting as a protected OSHA whistleblower) continuing to investigate and expose such wrongful acts by Defendants. As set forth herein, Plaintiff was wrongfully fired for performing her State of California job, and Plaintiff's dedication to performing her job at the highest level, including acting as a whistleblower, may end up costing Plaintiff her life.

4.      Plaintiff is hereunder seeking recovery of damages inflicted on Plaintiff by the Defendant government agencies and contractors while Plaintiff was employed by the California Department of Corrections and Rehabilitation/California Correctional Health Care Services (CDCR/CCHCS). Moreover, Plaintiff is seeking recovery of damages from CDCR/CCHCS for wrongful termination/retaliatory discharge on pretextual grounds, notwithstanding Plaintiff's protected status as an employee of the State of California who is covered by:

(A) being a protected employee who was on approved FMLA prior to termination;

(B) being a protected employee who was also on paid administrative leave at the time

of her firing, which administrative leave was never modified; and

(C) Plaintiff was protected by the California Occupational Safety and Health

Administration (Cal-OSHA) as a Whistleblower at the very time Plaintiff was

wrongfully fired.

5.      Plaintiff is a 60-year-old woman, born and raised in Sacramento, California, with two

(2) adult children and three (3) grandchildren.  Plaintiff graduated from a private high school

and attended a private business college in Sacramento, California before embarking on a career

with the State of California, where Plaintiff continued her education through her employer.

Plaintiff has no criminal arrest history and was employed with the State of California for 26 +

years with no prior disciplinary actions.

6.      Plaintiff's most recent job since 2010 was with the CDCR/CCHCS as a Staff Manager

II.  The CCHCS was established pursuant to the *Plata* Court order[1] which placed the CDCR

medical health care program under federal Receivership, due to cruel and unusual punishment

and deliberate indifference, and required CDCR to implement certain reforms.  The *Plata*

Court appointed a Receiver responsible for the oversight of these reforms.  Plaintiff led a team

of health care specialists and managers who monitored CDCR's compliance with the *Plata*

Order and worked closely with the Office of the Inspector General who carried out statutorily

required medical inspections of the prisons.

7.      Prior to this position, Plaintiff worked in the CDCR Mental Health program from 2008-

2010 during which time Plaintiff was responsible to estimate the staffing needs in the 35

prisons.  The Mental Health program was also placed under a Special Master pending certain

---

[1] Plata v. Schwarzenegger, docket no. 3:01-cv-01351-TEH (N.D. Cal.)

reforms². The *Plata v. Schwarzenegger* and *Coleman v. Schwarzenegger* were separate class

actions concerning health care conditions in California state prisons. Although the cases were

decided separately, they resulted in similar outcomes: the district court in each case determined

that the lack of adequate physical or mental care violated the prisoners' Eighth Amendment

rights, leading to years of court orders designed to remedy the violations.

8.      Attached hereto as **Exhibit A** is a true and correct copy of Plaintiff's Duty Statement.

Attached hereto as **Exhibit B** is a true and correct copy of Plaintiff's Probation Report from

Plaintiff's most recent appointment as a Staff Services Manager II, providing Plaintiff with an

overall rating of "Outstanding," which states, among other things:

> "Dawn...you are proactive, forward thinking, highly-skilled, knowledgeable and dependable. You have built a skilled, competent and effective team....you have an extremely strong command of the complex subject matter related to the Office of the Inspector General medical inspections and the Prison Law Office....You are wonderful, and we are lucky to have you in our office providing the service and expertise that you do. I thank my lucky stars every day that you accepted the position." Signed by: Lara Saich and Janet Lewis

The above-referenced Probation Report was written and signed by Plaintiff's two (2) managers

in 2015 who later turned on Plaintiff and harassed and systematically worked to wrongfully

terminate Plaintiff on July 23, 2018, because Plaintiff had suspected that inmates were being

---

² Coleman v. Schwarzenegger, docket no. 2:90-cv-00520-LKK-JFM (E.D. Cal.),

experimented upon and reported it.  Plaintiff believes she was made an experimental test

subject herself because of Plaintiff's protected disclosure.

9.       Plaintiff was placed on paid Administrative Leave on April 4, 2018, following the

discovery by Plaintiff's staff, Joanne Bagan, of another complaint from an inmate claiming he

was being experimented upon and coerced into the mental health program which Plaintiff

provided to Plaintiff's manager, Lara Saich.  The Notice of Administrative Leave required

Plaintiff to do, in part, as follows:



Plaintiff believes Defendants wanted to know if Plaintiff had made and kept a copy of the

inmate complaint, and further, wanted Plaintiff out of the office to avoid the discovery of

additional complaints by inmates of nonconsensual experimentation.  Attached hereto as

**Exhibit C** is a true and correct copy of the "Notice of Administrative Leave," April 4, 2018.

10.      These wrongful and illegal actions by the defendant government agencies and their

private contractors may also violate various settlement agreements reached by the State of

California with the United States Justice Department, including but not limited to Orders

entered in the matter of Plata v. Schwarzenegger, docket no. 3:01-cv-01351-TEH (N.D. Cal.)

and Coleman v. Schwarzenegger, docket no. 2:90-cv-00520-LKK-JFM (E.D. Cal.), regarding

violations by the California Department of Corrections and Rehabilitation of requirements for

the proper care and treatment of inmates in the California penal system.

11.     As set forth herein in more detail, Plaintiff's superiors at CDCR/CCHCS wrongfully hindered, obstructed, blocked, and ultimately smothered the Plaintiff's continuing investigations into illegal, non-consensual research on CDCR inmates, including but not limited to the invocation of the "State Secrets Privilege." When the State Secrets Privilege (SSP) is invoked, the government submits an affidavit saying that any court proceedings would risk disclosure of secrets that would threaten national security and then asks the court to dismiss the suit based solely on those grounds. Previous uses of the SSP by the government have most commonly been at the discovery stage, asking the courts to deny people access to documents or witnesses. More recently – and more troublingly – the government has invoked the SSP in the very beginning of cases to dismiss them altogether. In these cases, the government has argued that to even answer the complaint by confirming or denying its allegations would risk the disclosure of secrets that could cause "exceptionally grave damage to the national security." The state secrets privilege undermines the very idea of an independent judiciary; contradicts the core idea of judicial review, which is independent judges making independent evaluations of all of the facts; and essentially allows the executive branch to dictate to the federal courts what cases they can and can't hear.

12.     Plaintiff's superiors at CDCR/CCHCS hindered, obstructed, blocked and ultimately smothered Plaintiff's investigations into possible wrongful nonconsensual experimentation and false mental health diagnosis of California inmates which Plaintiff is required to report. Plaintiff had signed a "Zero Tolerance Code of Silence" policy requiring Plaintiff to report suspected illegal activities.   Plaintiff believes California inmates are still wrongfully being subjected to nonconsensual experiments and false mental health diagnosis in violation of the Order.

13.     As set forth herein in more detail, Plaintiff was involuntarily placed into an illegal nonconsensual experimentation program by CDCR/CCHCS, and various federal agencies, after her Whistleblowing activities.

14.     Plaintiff believes she was placed into this radiation-research program according to the "secret interpretation" of the Patriot Act and process for labeling a person as a "domestic terrorist" (which does not require a person to actually be a terrorist by any commonly understood definition) by the "High-Value Detainee Interrogation Group" (HIG), headed up at the time by former FBI Director, James Comey; former CIA Director, John Brennan; former Secretary of Defense, Ash Carter; former Attorney General, Eric Holder, and former President Obama.  Plaintiff further believes her employer, CDCR/CCHCS ratified the decision and acquiesced to federal official's requests when they began experimenting on Plaintiff in her workplace.

15.     Plaintiff believes that placement on the list is based, at least in part, on the "2013 Watchlisting Guidance" which was classified as Secret by Eric Holder to conceal these illegal and wrongful acts and was recently leaked.  To the best of Plaintiff's knowledge, the "2013 Watchlisting Guidance" document remains classified and, therefore, is not included in this filing in deference to national security.

16.     Vast investments have been made in Directed Energy Weapons, Radio Frequency Weapons, and the Orion spacecraft for a manned mission to Mars.  Neither the weapons, nor the Orion can be used until the radiation effects are understood and risks reduced to acceptable levels. .  The federal government has a lengthy and well-documented history of conducting radiation experiments on thousands of unwitting participants for biomedical science, defense weapons and space exploration.  In fact, the Department of Justice is currently paying claims to

prior victims and has paid out more than 2 billion thus far.  A true and correct copy of "Justice News, Office of Public Affairs," showing claims paid as of March 2015 is attached hereto as **Exhibit E**.  abundantly clear these are the same experiments being carried out on Plaintiff, they just found a sneakier way to do it which is explained in Section V.

## II. THE PARTIES

### A.  DOES 1-20

17.     Plaintiff is informed and believes and thereon alleges that each of the Defendants designated as a DOE are intentionally and negligently responsible in some manner for the events and happenings herein referred to, and thereby proximately caused injuries and damages as herein alleged. The true names and capacities of DOES 1 through 20, inclusive, and each of them, are not now known to me who therefore sues said Defendants by such fictitious names and will be added to this action as provided by California Code of Civil Procedure Section 484.

### B.  State Defendants

18.     The California Department of Corrections and Rehabilitation is responsible for the operation of the California state prison and parole systems. The California Correctional Health Care Services was established pursuant to the *Plata* Court order, Plata v. Schwarzenegger, docket no. 3:01-cv-01351-TEH (N.D. Cal.) which placed the CDCR medical health care program under federal Receivership, due to cruel and unusual punishment and deliberate indifference that required CDCR to implement certain reforms.  The *Plata* Court appointed a Receiver responsible for the oversight of these reforms.

19.     **Defendant Lara Saich** is the current Deputy Director of the Risk Management Branch for the California Department of Corrections and Rehabilitation/California Correctional Health Care Services.  Address:  8260 Long Leaf Drive, Bldg. C,, Elk Grove, California 95758

20.     **Defendant Janet Lewis** is the former Deputy Director of the Risk Management Branch

of the California Department of Corrections and Rehabilitation/California Correctional Health

Care Services and is currently working as a retired annuitant.  Address:  8260 Long Leaf Drive,

Bldg. C,, Elk Grove, California 95758.

21.     **Defendant Christine Milne** is a Staff Services Manager I, in the Disability

Management Unit, California Department of Corrections and Rehabilitation/California

Correctional Health Care Services.  Address:  8260 Long Leaf Drive, Bldg. B., Elk Grove,

California 95758.

22.     **Defendant Christopher Gates** is an Information Technology Analyst in the California

Department of Corrections and Rehabilitation, Office of Business Services, Information

Technology.  Address: 8260 Long Leaf Drive, Bldg. C, Elk Grove, California 95758.

23.     **Defendant Marie Blake**, District Manager, California Occupational Safety and Health

Organization (Cal-OSHA).  The Division of Occupational Safety and Health of California is an

agency of the Government of California established by the California Occupational Safety &

Health Act of 1973 and administered by the California Department of Industrial Relations.

Cal/OSHA's mission is to protect public health and safety through research and regulation

related to hazards on the job in California workplaces.  Address:  2424 Arden Way, Suite 165,

Sacramento, California  95825.

**C.     Federal Defendants.**

24.     **Defendant: Dr. Michael Griffin**, Under Secretary of Defense for Research and

Engineering.  The Department of Defense is an Executive branch of the department of the

federal government of the United States charged with coordinating and supervising all agencies

and functions of the government concerned directly with national security and the United

States Armed Forces. Dr. Michael Griffin is the Department's Chief Technology Officer, and is responsible for the research, development, and prototyping activities across the DoD enterprise and is mandated with ensuring technological superiority for the Department of Defense. He is a registered professional engineer in California. He oversees the activities of the Defense Advanced Research Projects Agency (DARPA), the DoD Laboratory enterprise, **and the Under Secretariate staff focused on developing advanced technology and capability for the U.S. military**. Relevant to this matter, his earlier career included Chief Engineer and Associate Administrator for Exploration at NASA and Chief Operating Officer of In-Q-Tel, which is a non-profit capital venture arm of the CIA. The DOD is also part of the "High Value Detainee Interrogation Group."

25.     **Defendant: Jefferson Sessions, United States Department of Justice (DOJ).** The U.S. DOJ is a federal Executive department of the United States responsible for the enforcement of the law and administration of justice in the United States.   The department is headed by the United States Attorney General, who is a member of the Cabinet. The current Attorney General is Jefferson Sessions. Address: United States Department of Justice, Justice Management Division, 950 Pennsylvania Avenue. Address:  (In cases wherein the Attorney General of the United States is a named party to an action in his official capacity, service must be provided to the: Assistant Attorney General of the United States, Justice Management Division, 950 Pennsylvania Avenue, NW Room 1111, Washington DC 20530.) (Federal Rules of Civil and Criminal Procedure within the purview of subsection (a) of section 208 of the Department of Justice Appropriation Act, 1953 (66 Stat. 560 (43 U.S.C. 666(a))).

26.     **Defendant: Christopher Wray**, Director, Federal Bureau of Investigations. The FBI is the investigative arm of the U.S. Department of Justice.  The FBI is the head agency of the "High-Value Detainee Interrogation Group."

27.     **Defendant: Gina Haspel, Director**, Central Intelligence Agency.  The CIA is an independent federal agency.

28.     **Defendant: Eugene Yu Director, NASA Ames Research Center**.  NASA Ames Research Center is a major research center at Moffett Federal Airfield in California.  Its parent company is the National Aeronautics and Space Administration (NASA) which is an independent agency of the Executive branch of the federal government of the United States responsible for the civilian space program, as well as aeronautics and aerospace research.

29.     **Defendant:  Kirsten Nielsen, Secretary, United States Department of Homeland Security**.  The United States Department of Homeland Security is a cabinet department of the United States federal government with responsibilities in public security.  Address: Department of Homeland Security, 3801 Nebraska Avenue, NW, Washington. DC 20016.

**D.     Federal Government Contractors**

30.     **Defendant: Maxar Technologies/DigitalGlobe**:   DigitalGlobe is an American commercial vendor of space imagery and operator of civilian remote sensing spacecraft. DigitalGlobe and MDA Holdings merged to become Maxar Technologies on October 5, 2017. Address:  1300 W. 120th Avenue, Westminster, CO 80234.

31.     **Defendant: BINJ Laboratories**:  Joseph Noonan, Chief Executive Officer.  BINJ Laboratories is a team of inventors with "100 years combined Department of Defense government contracting experience." Address:  15 Old Dock Street, Scituate, MA 02066.

32.    **Defendant:  Screened Images d/b/a "Corrections.com:"**  Joseph Noonan, Owner,
Tim Blake, Owner.  Corrections.com is an online global community for corrections.  Address:
15 Mill Wharf Plaza, Scituate, MA 02066.

33.    **Defendant:  Screened Images d/b/a "Screened Images Multimedia":**  Laura
Noonan, President.  Screened Images Multimedia (SIM) is a small, woman-owned software
and multimedia firm.  Address: 159 Burgin Parkway Quincy, MA 02169

34.    **Defendant: Duane Essex:**  9425 Dunkerrin Way, Elk Grove, California 95758


## III.    JURISDICTION AND VENUE

35.    Jurisdiction of this Court is invoked pursuant to: 28 U.S.C. § 1331.  These actions at
law for money damages arise under 28 U.S.C. § 2679; 42 U.S.C. § 1983; the United States
Constitution; the laws and Constitution of the State of California and common law principles to
redress a deprivation under color of state law of rights, privileges and immunities secured to I
by said statutes, and by the Fourth and Eighth Amendments of the United States Constitution.

A.    Jurisdiction; NASA

36.    The Federal Tort Claims Act is the "exclusive" administrative remedy regarding
claims against NASA.  (Jarrett v. United States, 874 F.2d 201 (4th Cir. 1989) (noting claims of
personal injury or death from the negligence of NASA's medical personnel.  [42 U.S.C. §
2458a].

B.    Long Arm Statute; California Code of Civil Procedures § 410.10

37.    Jurisdiction is proper pursuant to the California Code of Civil Procedures
§ 410.10 "the Long-Arm Statute" which provides the long-arm jurisdiction of California courts
coextensive with constitutional boundary lines.  Specifically, "a court of this state may exercise

jurisdiction on any basis not inconsistent with the Constitution of this State or of the United States."

C.     Personal Jurisdiction

38.     This Court has personal jurisdiction over Eugene Yu and the National Aeronautics and Space Administration (NASA) Ames Research Center, as it is located in the state of California and these causes of action arise from or are connected with Defendant's extensive operations and activities in California State, and the acts described herein by this Defendant occurred in this District.

39.     This Court has personal jurisdiction over the California Department of Corrections and Rehabilitation (CDCR) as it is a California Statewide Governmental Agency headquartered in this district, and the acts and causes of action described herein by this Defendant occurred in this District.

40.     This Court has personal jurisdiction over Defendant Lara Saich, Deputy Director, California Department of Corrections and Rehabilitation, California Correctional Health Care Services (CDCR/CCHCS) because she is domiciled in Carmichael, California, which is in this district.

41.     This Court has personal jurisdiction over Defendant Janet Lewis, former Deputy Director and retired annuitant, California Department of Corrections and Rehabilitation, California Correctional Health Care Services (CDCR/CCHCS) because she is domiciled in Elk Grove, California, which is in this district.

42.     This Court has personal jurisdiction over Defendant Christine Milne, California Department of Corrections and Rehabilitation, California Correctional Health Care Services (CDCR/CCHCS) because she is domiciled in Sacramento, California, which is in this district.

43.     This Court has personal jurisdiction over Defendant Christopher Gates, California Department of Corrections and Rehabilitation, California Correctional Health Care Services (CDCR/CCHCS) because he is domiciled in Sacramento, California, which is in this district.

44.     This Court has personal jurisdiction over Dr. Michael Griffin and the United States Department of Defense (DOD) as it is a nationwide agency and these causes of action arise from or are connected with Defendants' extensive operations and activities in California State, and the acts described herein by these Defendants occurred in this district.

45.     This Court has personal jurisdiction over Attorney General Jefferson Sessions and the United States Department of Justice as it is a nationwide agency and these causes of action arise from or are connected with Defendants' extensive operations and activities in California State, and the acts described herein by these Defendants occurred in this district.

46.     This Court has personal jurisdiction over Secretary Kirstjen Neilsen, and the United States Department of Homeland Security because it is a nationwide agency and these causes of action arise from or are connected with Defendants' extensive operations and activities in California State, and the acts described herein by this Defendant occurred in this district.

47.     This Court has personal jurisdiction over Secretary Christopher Wray and the United States Federal Bureau of Investigations as it is a nationwide agency and these causes of action arise from or are connected with Defendant's extensive operations and activities in California State, and the acts described herein by this Defendant occurred in this District.

48.     This Court has personal jurisdiction over Gina Haspel, and Central Intelligence Agency as it is a nationwide agency and these causes of action arise from or are connected with Defendant's extensive operations and activities in California State, and the acts described herein by this Defendant occurred in this District.

49.     This Court has personal jurisdiction over the California Occupational Safety and Health Administration (Cal-OSHA) and Marie Blake, as it is a California Statewide Governmental Agency, and the acts and causes of action described herein by this Defendant occurred in this District.

50.     This Court has personal jurisdiction over Duane Essex as he is domiciled in Elk Grove, California and the acts described herein by this Defendant occurred in this District.

51.     This Court has personal jurisdiction over Joseph Noonan and Tim Blake, Owners, "Screened Images Corrections.com" as these causes of action arise from or are connected with Defendant's extensive operations and activities in California State, and the acts described herein by these Defendants occurred in this District.

52.     This Court has personal jurisdiction over DIGITALGLOBE/MAXAR Satellite since these causes of action arise from or are connected with Defendant's extensive operations and activities in California State, and the acts described herein by this Defendant occurred in this District.

D.   Venue

53.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(3).  This Court is the proper venue to hear this case.  I am a United States Citizen and resided in this District at all times when the acts described herein occurred.

## IV.     RADIATION RESEARCH – RELEVANT HISTORY

A.   Executive Branch "Advisory Committee on Human Radiation Experimentation.

54.     In 1994, former President Clinton established an "Advisory Committee on Human Radiation Experiments" (ACHRE) in response to the many complaints being made.  The ACHRE conducted an in-depth investigation and presented its key findings, which shows the

same radiation experiments being conducted on Plaintiff for biomedical, defense and space

exploration were also conducted on thousands of other victims.  Key findings from the

ACHRE include, in pertinent part:

> "Between 1944 and 1974, the federal government sponsored several
> thousand human radiation experiments. In the great majority of cases, the
> experiments were conducted to advance biomedical science; some
> experiments were conducted to advance national interests in defense or
> space exploration; and some experiments served both biomedical and
> defense or space exploration."

A true and correct copy of the Executive Branch "Advisory Committee on Human Radiation

Experiments; Key Findings"" is attached hereto as **Exhibit M.**

55.      The ACHRE also included recommendations for implementing actions to prevent

similar, future occurrences.  Recommendations of the ACHRE include, in pertinent part:

> "Appropriate remedies for those who were wronged or harmed were of
> critical importance, but remedies alone speak only to the past, not the future.
> It is equally important that, the historical record having been spelled out and
> appropriate remedies identified, we as a nation move forward and take
> action to prevent similar occurrences from happening in the future"

A true and correct copy of the "Advisory Committee on Human Radiation Experimentation;

Recommendations" is attached hereto as **Exhibit N.**

56.      The ACHRE further noted the "arrogance" of the federal government actors and

biomedical community and made it clear that these types of experiments should never happen

again:

"....it was a time of arrogance and paternalism on the part of government officials and the biomedical community that we would not under any circumstances wish to see repeated."

B.  The "Radiation Exposure Compensation Act," (RECA), Public Law 101-426.

57.    In 1992, Congress had enacted the "Radiation Exposure Compensation Act," (RECA), Public Law 101-426, to hold the federal government accountable for another batch of victims of nonconsensual radiation experiments, which states in pertinent part:

"The health of the individuals who were unwitting participants in these tests was put at risk to serve the national security interests of the United States," and "the United States should recognize and assume responsibility for the harm done to these individuals."

Congress also "apologized on behalf of the nation" and allocated funds for partial restitution to victims.  Over 2 billion dollars have been paid out, according to a Department of Justice document.

(c) APOLOGY.—The Congress apologizes on behalf of the Nation to the individuals described in subsection (a) and their families for the hardships they have endured.

A true and correct copy of Public Law 101-426, the "Radiation Exposure Compensation Act" is attached hereto as **Exhibit O**.

58.    The blatant disregard for human life is demonstrated in that there was only four (4) years between the enactment of the RECA, Public Law 101-426, and the establishment by the Executive Branch of the "Advisory Committee on Human Radiation Experiments."  Indeed, the federal government had not even paid off the one batch of victims and attempted to

circumvent it altogether by intentionally concealing their activities, before the second batch of

victims were revealed.  The second batch revealed by the ACHRE included 4,000 cases.   The

ACHRE made special notes related to the intentional concealment of these actions, and the

consequences thereof, which included delayed detection and intervention of potentially life-

saving measures:

"Deliberate deception and cover up of the misuse of both civilians and military personnel in nuclear weapons development and radiation research caused delays in medical treatment for the victims"

### V. THE REMOTE RADIATION RESEARCH PROGRAM

59.     Defendants are conducting these experiments remotely using implanted wireless

biomedical devices made from 'nanomaterials' and using "wireless medical telemetry"

also known as "Telemed" in the prisons.  Biomedical electronic devices are commonly

used in the medical world to monitor a person's blood pressure, heart rate, glucose, etc.,

and send the data out via radio frequency.  Implantable devices include a 'network of

nodes' (or semiconductors) which includes biosensors, working together to "sense" what

is happening inside a person's body and gather and report out, via remote radio signal.  A

network of these devices is referred to as a "Wireless Body Area Network" (WBAN).  A

true and correct copy of the "IEEE Wireless Body Area Network for e-Health

Applications, January 24, 2018" is attached hereto as **Exhibit F**.  Electronic tests run on

my body have confirmed that I have an electronic network implanted in my body.

60.     Plaintiff was tested by AAA Security on four (4) separate occasions in September and

October 2017, who found several "semiconductors" operating in Plaintiff's body, in

various places, which were analyzed and determined to be a "Wireless Body Area Network." Plaintiff understands that staff of AAA Security are trained and certified in the use of highly specialized equipment used also by the Department of Homeland Security, the Federal Bureau of Investigations and the Central Intelligence Agency to detect covert electronic devices implanted in a person's body. I further understand that AAA Security staff are trained in technical surveillance countermeasures by professional staff including, but not limited to: former Counterintelligence Special Agents for the United States Army; highly-trained law enforcement executives; FBI National Academy graduates with experience conducting missions for the Department of Defense; Department of Homeland Security; NATO; United Nations; and, the Secretary of Defense and more. The specialized equipment used by AAA Security experts are designed and capable to detect covert devices illegally implanted in a person's body and also detecting the associated radio frequencies the devices are operating on which can then be used to identify the users and holders of the licenses for the frequencies, and such information can then be used to secure legal protective orders to stop the transmissions.

61.     Plaintiff was referred to a Plastic Surgeon, in Atlanta, Georgia, who removed three (3) of these electronic devices from Plaintiff's body, which were analyzed by an independent laboratory and forensic toxicologist, Dr. Hildegarde Staninger, RIET-1[3] who confirmed the specimens were biomedical devices and also noted the devices included materials **specifically designed to monitor cancer and radiation**, and certain piece parts, in particular, were built by

---

[3] RIET-1 means that Dr. Hildegarde Staninger, RIET-1 is the first "Registered Industrial and Environmental Toxicologist ever to be registered in this field.

the U.S. Naval Laboratory. According to the report from Dr. Staninger, the devices were described as:

"Man-made sensor devices used in implantable delivery systems," and "Remote sensory technology that make up an electro piece-part system used in the monitoring of chronic diseases, such as cancer, or other diseases associated with pain or paralysis (bell's palsy).

62.    The network implanted in Plaintiff's body, referred to as a "Wireless Body Area Network (WBAN) can only be accessed by unlocking it using a specific key. The person with the key is referred to as the "Body Area Controller." Below is an excerpt from the Patent for the device:

"The BAN (body area network), under the control of a body area controller (BAC), may be unlocked based upon a pre-defined patient action performed by the patient and the BAN may then be connected to a wireless device. The BAN medical data of the patient may then be transmitted by the wireless device."

Attached hereto as **Exhibit G** is a true and correct copy of the United States Patent "Unlocking a Body Area Network." This patent shows the implanted person has the key to unlock the body network. Plaintiff does not have a key. There is another way to unlock it remotely using a "Raman Key" developed by NASA, which sends sound signals received by the brain as a color. It is a color-coded signal that Plaintiff does not possess. The signal comes in red, white and blue, which Plaintiff is able to see and knows when it

is happening.  It is unknown how many individuals have the key and technology to access Plaintiff's body.

> ➢ Plaintiff is  literally in custody of Defendants by virtue of this electronic network implanted in Plaintiff's body, which allows Defendants to manipulate and control Plaintiff's body, and to which Defendants have the only key.  Plaintiff is, therefore, in custody, which creates a duty to protect.

> ➢ Plaintiff is being forced to provide a service to Defendants, involuntarily, which meets the definition of "Involuntary Servitude."

> ➢ The purpose for the implanted network inside Plaintiff's body is to monitor Plaintiff's physiological responses to the radiation and radiation-related cancer/disease experiments.

63.     In addition to discovering the network of devices -aka- "Wireless Body Area Network (WBAN)" implanted in Plaintiff's body, the full spectrum analyzer used by AAA Security during their testing recorded the radio frequency signals that the implanted devices were operating on were licensed for use by the majority of the Defendants.  Since that time, upon the advice of experts, Plaintiff has been running a spectrum analyzer to keep contemporaneous records to show the consistency of the transmissions.

64.     Other materials found in Plaintiff's body and in the devices that were surgically removed include, but are not limited to: "e-Coli," arsenic, cyanide, asbestos, cadmium, poisonous amounts of lead and mercury, Uranium and its decay by-products, including Cesium, thorium, bismuth, barium, gold, nickel and more; radioactive ligands; human cervical cells which seemed strange since Plaintiff has not had a cervix since her hysterectomy about 20 years ago, but then learned the cells were "man made cell lines (immortalized

cells) from the HeLa (Henrietta Lacks cells) for use in attempting to cure cancer (this

infers they were causing cancer first); anti-epileptic drugs (Plaintiff is not epileptic); novel

pain medication (inferring Plaintiff needed to be in pain), three different types of snake

venom, one of which may have been used to develop a blood thinner currently on the

market. Many of these materials are tumor and cancer initiators, and others are direct

indicators of radiation and cancer experiments. The devices are made from nanomaterials

which were also found in diagnostic tests and are in a league of their own and have not

been evaluated for safety. Plaintiff was provided with detailed reports on the devices,

materials and toxicological risk assessment by Dr. Hildegarde Staninger, Ph.D., RIET-1[4],.

The final report by Dr. Staninger is pending certain test results. Dr. Staninger is an expert

in forensic toxicology and analysis in the investigations of suspicious deaths and foul play for

private individuals and law enforcement agencies, nationwide. Dr. Staninger is knowledgeable

in these government-sponsored experiments, and knowledgeable about nanotechnology. Dr.

Staninger developed and guided me through a phased battery of tests to determine whether I

was being used for government-sponsored radiation experiments. Dr. Staninger is a forensic

scientist with a doctorate in Toxicology; Certified Industrial Environmental Toxicologist;

Certified Compliance Safety Officer; Graduate OSHA Institute; and Doctor of Integrative

Medicine. She is nationally recognized as an authority in the field of Industrial Toxicology

by academia and federal and state regulatory agencies in that she quite literally 'wrote the

book' on "The Comprehensive Handbook of Hazardous Materials, Safety, Monitoring, and

Regulations" which is the university required text for the Industrial Hygienist/Environmental

---

[4] RIET-1 means that Dr. Hildegarde Staninger is the first "Registered Industrial Environmental Toxicologist."

Health Degree/Training Programs, and the reference text used by the United States Department of Labor, Occupational Safety and Health Administration for their new "1910.1200 Hazard Communication Standard for Identification of Hazardous Chemicals for Small Businesses."   Her relevant certifications include: (1) Industrial Toxicologist and Doctor of Integrative Medicine; (2) International Environmental Intelligence Agency (IEIA) BioEnergy Field Professional Cert. No. 20150911005; (3) Registered Industrial Environmental Toxicologist Cert(s) No.: RIET-1; (4) IEIA Nanophotonics and Computational Toxicology Certification.  NREP Certified Environmental and Safety Compliance Officer Cert No.: 7774709608161213.  NOTE: This is the same certification that is used by agents of the Federal Bureau of Investigation and the Department of Homeland Security in collecting similar samples and evidence.  She is the first scientist to identify a nanotechnology brain chip in an individual that originally was identified by UCLA Neurosurgeons and Pathology Department as a mengionoma.  Dr. Staninger authored a textbook on the topic "Global Brain Chip and Mesogens," Xulon Press, Inc., Maitland, FL © 2016.  Dr. Staninger can act as an Expert witness and can consult, provide reports, and testify on all areas involving the testing, treatment, prevention, management plans and damage related to chemical health hazards in industrial and non-industrial environments.  Dr. Staninger's work history includes, but is not limited to governmental agencies, aerospace, telecommunications, and academia in the fields of industrial hygiene, toxicology (industrial, environmental, clinical, and forensic), risk management/product liability, education, and special research projects for chemical exposure in the environment, home, and workplace of all species.  Other noteworthy licenses and certifications, academic appointments, scientific and investigational research projects, and professional organizational memberships, include:  Member of the Board of Directors,

Toxicologist, Desert Storm Veteran Coalition (1992-present); Professional Member of the American College of Toxicology; The American Association of the Advancement of Science; World Safety Organization; American Chemical Society; American Society of Cellular and Computational Toxicology; American Industrial Hygiene Association; American Board of Forensic Examiners; World Safety Organization; and Scholar Energy Medicine Professional Organization.

65.    Defendants who placed these materials in Plaintiff's body had full knowledge of the unknown dangers of nanomaterials. According to the National Institute for Occupational Safety and Health (NIOSH) literature:



"We do not fully know how these engineered nanoparticles may enter the body, where they may travel once inside, or what effects they may have on the body's systems. We do not fully know whether or how effects may differ for chemically or structurally different particles at the nanoscale."

Attached hereto as **Exhibit H** is a true and correct copy of the NIOSH "Interim Guidance for Medical Screening and Hazard Surveillance for Workers Potentially Exposed to Engineered Nanoparticles."

66.    At the time of Plaintiff's testing by AAA Security, they also noted they found an older, rusted out metal system in Plaintiff's body, partially functioning. Plaintiff believes she was implanted by Kaiser Permanente, several years prior, who has a contract with In-Q-Tel where Defendant Dr. Michael Griffin used to work. In-Q-Tel is a nonprofit venture capital arm of the Central Intelligence Agency (CIA). Dr. Griffin's relevant career path went from NASA to In-Q-Tel to the DOD. Plaintiff believes she was implanted with the older, metal system at Kaiser

and with the new system made from nanomaterials during a routine private plastic surgery later.

67.     It is important to point out that while James Comey was with the Department of Justice, he was responsible for the "Radiation Exposure Compensation Act" (RECA), which was the public law passed by Congress to compensate the last group of victims of non-consensual radiation experiments.  James Comey signed the amended RECA which expanded the criteria for compensation.  The first group of victims had not been paid off before the second group was revealed by an Executive Branch "Advisory Committee on Human Radiation Experiments" (ACHRE) established during the Clinton Administration who found several thousand cases of non-consensual radiation experiments were conducted on unwitting participants to "advance biomedical science, defense weapons and space exploration," the very same experiments being carried out now.  The Committee made recommendations to ensure this would never happen again, but it did anyway. Defendants manipulated language in the Patriot Act and other related documents, such as the National Defense Authorization Act, to supposedly 'authorize' these illegal and wrongful acts against Americans to create a pool of test subjects to complete their radiation experiments which were stopped short again when they got caught.

68.     Plaintiff believes that James Comey left the DOJ and went to work for Lockheed Martin to learn about the technology, then to Bridgewater, one of the largest hedge funds in the world, where he spent about three years learning about investment and asset management, then he was appointed to the Board of Directors at HSBC bank, who was previously caught for money laundering and was placed under a "deferred prosecution plan" that required them to pay an estimated 1.2 billion over 5 years.  After several months at HSBC bank, Comey was

appointed the head of the FBI and by extension became the head of the "High Value Detainee

Interrogation Group" with the power to label an American Citizen as a "domestic terrorist"

which allows the military to indefinitely "detain" the person and authorize the use of military

force against them.  This technology can, and does, electronically detain a person.  Below is a

copy of the power point slide from Lockheed Martin describing the functions they wanted in a

biosensor which included "novel immobilization techniques."



Ultimately, Comey, Brennan, Carter and Holder had the power to round up a group of test

subjects and Comey may have even worked with HSBC bank, who was indebted, to create

investment asset portfolios for each of the victims in order to defray costs for the program.

This makes more sense when you consider the "cancer experiments" as a part of the program.

This would explain the 3 years at Bridgewater and his position in the Board of Directors for

HSBC bank, which are clearly not in his career path.  After several months with the HSBC

bank, Comey returned and was appointed as the Director of the FBI.  This occurred following

Eric Holder's announcement on March 5, 2012 that everything was about to change.  In this

speech, Holder states:

"A careful and thorough executive branch review of the facts in a case

amounts to 'due process,' and the Constitution's Fifth Amendment

protection against depriving a citizen of his or her life without due process
of law does not mandate a 'judicial process.'"   Holder thus also declaimed
that anyone labeled a "domestic terrorist" (according to the "secret
interpretation) has no right to a defense, no right to speak on his/her behalf,
no right to examine and refute the evidence against him/her and no right
even to know his/her life will be taken under the decision of a few men in
Washington."

69.   Lastly,  Plaintiff believes this program is what Senator Wyden was talking about in his

speech to Congress in May 2011, wherein he states, in pertinent part:

"Mr. President, the United States Senate is now preparing to pass another
four-year extension of the USA Patriot Act. I have served on the
Intelligence Committee for a decade, and I want to deliver a warning this
afternoon:  when the American people find out how their government has
secretly interpreted the Patriot Act, they will be stunned, and they will be
angry. And they will be asking senators, "Did you know what this law
actually permits?" "Why didn't you know before you voted on it?"  The
fact is that anyone can read the plain text of the Patriot Act, and yet many
members of Congress have no idea how the law is being secretly
interpreted by the executive branch, because that interpretation is
classified. It's almost as if there are two Patriot Acts, and many members
of Congress haven't even read the one that matters.  Our constituents, of
course, are totally in the dark. Members of the public have no access to the

> "executive branch's secret legal interpretations, so they have no idea what
> their government thinks this law means."

Plaintiff believes Senator Wyden was referring to this program when he stated above:

> *"Did you know what this law actually permits?"*

Plaintiff believes Senator Wyden was referring to non-consensual human experimentation program, since the rest of his lengthy speech is a recitation on the history of non-consensual human experimentation on United States Citizens.  A true and correct copy of Senator Wyden's entire speech is attached hereto as **Exhibit I** .

70.    Plaintiff understands that being a Whistleblower, at this point in time, is now viewed akin to working with Osama Bin Laden, according to the Department of Homeland Security's "Insider Threat Program."  Attached hereto as **Exhibit J** is a true and correct copy of a letter to the Inspector General of the Intelligence Community, on behalf of 22 Agencies and Organizations, expressing concerns related to the "Insider Threat" program that characterizes Whistleblowers the same as actual terrorists. The letter states, in pertinent part:

> "We are concerned about the Office of the Director of National
> Intelligence's (ODNI) characterization of whistleblowers as insider threats,
> despite clear policy from the White House that those individuals should not
> be considered or targeted as such."
>
> "ODNI official Patricia Larsen, reiterated an overly broad definition of
> insider threats to include "any employees and contractors who damage an
> entity's reputation, be it government or business, by exposing inside
> information should be considered insider threats, as they 'would be in the
> business world.'" This kind of wanton misuse of the term "threat"

demonstrates that this program fails to distinguish between those who want to fix problems from those who wish to do harm to our national security. ODNI's silence following the reporting of this egregious mischaracterization sends the signal that the office sees whistleblowers as internal threats.

"This training is not the first time ODNI has erroneously conflated insider threats and whistleblowers. ODNI guidance improperly equates unauthorized disclosures of unclassified information with espionage and sabotage. When the office leading this program does not understand the distinction between a whistleblower and a genuine threat, there is a fundamental flaw in the Insider Threat Program."

71.     It is unknown whether there is any oversight, at all, of the HIG program, or if it is a "special access program" operating in complete secrecy.   According to HIG literature, the "Director" of the HIG is "a representative" of the FBI and the DOJ has oversight responsibility.  The "HIG Director" is assisted by "representatives" of the Central Intelligence Agency (CIA) and the Department of Defense (DOD).   Attached hereto as **Exhibit K** is a true and correct copy of the HIG Webpage showing the hierarchy for management of the HIG program.

72.     Each of the Defendants, including fictitious defendants, are responsible in some manner for the occurrences herein alleged, and the injuries herein alleged were proximately caused by the acts and/or omissions of some or all of them.

73.     According to Plaintiff's medical doctor and forensic toxicologist, Plaintiff is suffering from -inter alia- acute and chronic radiation poisoning, heavy metals poisoning including lead and mercury, blood disease/disorder and is guaranteed to get cancer.  The medical basis in

support of these claims is provided, in part, in the attached **Exhibit L**, Letter from Dr. Rima E. Laibow, M.D., Ph.D , dated July 19, 2018.

74.     Plaintiff remains in imminent danger and requires immediate protective orders and specific medical treatments and interventions, according to medical and scientific experts. Unless and until Defendants' unlawful practices as alleged herein are enjoined and restrained by court order, Defendants will continue to cause greater and irreparable injury to Plaintiff, including death.

## VI.     CURRENT RADIATION EXPERIMENTS BY AGENCY

A.   NASA Radiation Experiments.

75.     During the testing conducted by AAA Security, they detected the signal that belongs to the **International Space Station**.  NASA is conducting radiation research related to long term space flight.  The Orion is the vessel for the planned mission to Mars.  Approximately 12 billion dollars have been spent on the Orion Spacecraft, *which can't go anywhere until the radiation research is completed*.  A true and correct copy of NASA's "Human Research Program, Space Radiation" is attached hereto as "**Exhibit P**."

76.     Experiments for space radiation are conducted by 3-dimensional (operating on the x, y, and z axis), magnetically trapped neutrons/particles, directed at the person using radio signals or in the same way a missile guidance system would work.  Each of these ( x, y and z axis) can be coupled to the main 1.87 GHZ signal identified as belonging to Plaintiff's employer, CDCR, the Federal Bureau of prisons, and ICE.  During the scan of Plaintiff's body, the frequencies detected included: 1.87 GHZ, 1.874GHZ, 1.877GHZ, 1.878GHZ, 1.861GHZ, 1.862GHZ and 807.39MHZ.  The FCC Licenses for these signals are leased out to a company called "Screened Images, Corrections.com."  The FCC

licenses state they are to be used to manage (detect or jam) contraband cell phones in certain prisons.  Further, the license(s) state they can only operate within the prisons as shown on the attached diagrams taken from the Federal Communications Commission (FCC) website.  The licenses show the latitudes and longitudes they can operate within which does not include Plaintiff's place of employment or home.  Plaintiff possesses several videos of the beam inside and outside of Plaintiff's home and emitting from an overhead drone.  It is speculated Defendants may be using a plasma beam or focus device since they contracted with a plasma physicist, Patrick Diamond, of U.C. San Diego.  Attached hereto as **Exhibit Q** are true and correct copies of the FCC document showing AT&T leased the aforementioned radio frequencies to "Screened Images d/b/a/ Corrections.com."  Attached hereto as **Exhibit R** is a true and correct copy of the "Public Interest" statement showing the signals could only be used inside the prison areas and were to be used to manage (detect/jam) contraband cell phones.  Plaintiff phoned "Screened Images, Corrections.com" to ask why these signals were being transmitted towards Plaintiff in Elk Grove, California to which the Receptionist responded: "We don't do the cell phone program" and "Our guys don't even go to the prisons, they travel around in vans" or words to that effect.  Plaintiff later learned that "Screened Images, Corrections.com" is actually a DOD contractor who has another company "BINJ Laboratories" which is a group of "military scientists," according to their literature.  Plaintiff asked her employer who the contractor is that manages the contraband cell  phones and was told it is "Pyramid Technologies."   The immediate appearance is "Screened Images, d/b/a/ Corrections.com" operates under the BINJ company and is part of the HIG.

77.     Defendants are well-aware of the hazardous effects of exposure to ionizing radiation and space radiation.  According to NASA literature regarding radiation risks;

"The effects from acute radiation can be felt almost immediately and include nausea, vomiting, fatigue and central nervous system diseases which can lead to changes in motor function and behavior. The effects from chronic exposure can be experienced decades after exposure and results from accumulation over a long period of time. Chronic exposure can cause cancer, vision impairment, cataracts and degenerative and cardiac disease."

Also, according to NASA literature:

"The risks will be understood and controlled only with more basic research in the field of *cancer induction by charged particles.*"

"Cancer induction by charged particles" is the essence of the experiments and is carried out by 3-D magnetically trapped particles in a plasma beam directed at Plaintiff using a guidance system. Dr. Patrick Diamond, Plasma Physicist was hired by the Department of Homeland Security along with the California Council on Science and Technology to create this program under the auspices of the "Contraband Cell Phone Program." It was easily hidden within this program. It required a significant amount of radio frequency spectrum that was said to be needed for the cell phone program.

78.     According to experts, Plaintiff is suffering from both acute and chronic radiation poisoning, including the symptoms listed above in the NASA literature, and more, and will experience the effects decades after exposure, if she lives that long. A true and correct copy of the NASA document "Space Radiation Risks" is attached hereto as "**Exhibit Q.**"

B.     Department of Defense Radiation Experiments.

79.     The DOD is conducting radiation research to advance military readiness against radiation exposure and experiments related to the development of countermeasures, post-mitigation

measures; and other experiments such as the non-ionizing radiation in radio signals together with

ionizing radiation; the effects of Terahertz; the impact of high-flux electron beams; the impact of

short-pulse electromagnetic fields and more.   A true and correct copy of the Department of

Defense document "Radiation Health Effects Research Program JCP-7" is attached hereto as

**Exhibit R**.  This is a joint program carried out by DOD components and contractors, some of

which are named Defendants in this case.

80.     The DOD is also conducting radiation research which has to be done before they can roll out

the use of directed energy weapons and radio frequency weapons on the public.  These weapons are

going to be used by law enforcement and corrections.  A true and correct copy of the "Department

of Defense Directive 3200.19 "Human Effects Characterization of Non-Lethal Weapons" (Directed

Energy Weapons) is attached hereto as **Exhibit S**.  Note:  There are several types of directed

energy weapons.  It appears as though the needed testing for the "Active Denial System" is

complete.  The type of directed energy weapons being tested on Plaintiff are "radio frequency"

weapons for "electronic warfare."

C.     The National Atlantic Treaty Organization (NATO) and Directed Energy Weapons

81.     The testing of directed energy weapons is an international program coordinated by the

North Atlantic Treaty Organization (NATO).  Attached hereto as **Exhibit T** is a true and correct

copy of the pages from the NATO Technical Report TR-HFM 073, "The Human Effects of Non-

Lethal Technologies, Human Factors and Medicine Panel," document showing the United States is

the lead nation in directed energy weapons testing, internationally, and that the weapons had to be

tested on humans prior to their release.  The document describes the program and responsible

agencies as follows:

> The U. S. Joint Non-Lethal Weapons Program (JNLWP) was established 09 Jul 96,
>
> under DoD Directive 3000.3. The directive established joint service organizational



responsibilities and provided guidelines for the development and employment of non-lethal weapons. The directive designated the Commandant of the US Marine Corps as Executive Agent (EA) for the JNLWP. Under DoD Directive 3000.3, NLWs are defined as "weapons that are explicitly designed and primarily employed so as to incapacitate personnel or materiel, while minimizing fatalities, permanent injury to personnel, and undesired damage to property and the environment." (http://www.jnlwd.usmc.mil/)

82.     As shown in the above, the directed energy weapons were being designed to "incapacitate" personnel, without killing them, although they can be used for lethal force.  DOD contractor, Lockheed Martin, met with Academia to develop a nanotechnology based "biosensor" with "unique immobilization techniques" to "incapacitate" a person, among other things.  This was/is being used on Plaintiff.   Plaintiff reported to CDCR management "falling down" at work on three occasions after which Plaintiff describes being "electronically shocked and partially paralyzed."  Plaintiff believes CDCR management created incident reports from the three (3) events.  Below  is an excerpt from the "School of Biomedical Engineering, Science & Health Systems, Nanotechnology Dialog with Lockheed Martin" discussing "novel immobilization techniques" to incapacitate a person, among other things:



Below is another slide showing the desired functions of the biosensors, in general, based on "Piezoelectric Nano-biosensor Technology Platform." This is important because the analysis of one (1) of the devices surgically removed from Plaintiff's body was found to contain "piezoelectric electrospin nanofibers."



Also, of note, one of the Lockheed Martin slides shows photographs of the nanospin fibers, below on the left. To the right of this is a true and correct copy of a photograph of the nanospin fibers taken of one the devices removed from Plaintiff's body:



83.      The biomedical devices serve several purposes and can 'multi-function.'  They are being

used to receive radio signals to "direct the energy" (radiation) to a particular area of Plaintiff's

body in order to test the human effects on individual organs, etc.  Below is another slide indicating

targeting of  specific tissues and organs:



84.      The "incapacitation" feature was used on Plaintiff, to keep Plaintiff inside her home and

prevent her from going certain places, including to work.  Part of the incapacitation also includes

stopping/interrupting Plaintiff's heart, or slowing it down, and inability to take a breath for an

extended time.  The pain at times is unbearable to the point Plaintiff involuntarily screams out loud.

Plaintiff's family and friends have personally witnessed this and will testify to the same.

85.      The testing of the directed energy weapons is managed directly by the U. S. Joint Non-

Lethal Weapons Program through a series of organizations. According to the aforementioned NATO

report, the Air Force Research Laboratory established the Joint Non-Lethal Weapons Centre of

Excellence in 2001, around the same time Congress was approached with the proposition that the

directed energy weapons had to be tested.  Attached hereto as **Exhibit U** is a true and correct copy

of the Congressional Record, Senate, SR 2571, dated March 20, 2001, wherein Mr. Domicini states they need to be tested on humans and goats.

> Recently, the Marines unveiled a device known as Active Denial Technology, ADT. This is a non-lethal weapons system based on a microwave source. This device, mounted on a humvee or other mobile platform, could serve as a riot control method in our peacekeeping operations or in other situations involving civilians. This project and technology was kept classified until very recently.
>
> The Pentagon noted that further testing, both on humans and, evidently, goats will be done to ensure that it truly is a non-lethal method of crowd control or a means to disperse potentially hostile mobs. The notion that the Pentagon is using "microwaves" on humans, and especially on animals, has inflamed some human and animal rights groups. Among others it has simply sparked fear that a new weapon exists that will fry people. This is not the case. And, unfortunately, few of the media reports offer sufficient detail or comparisons to clarify the value of such a system or put its use in perspective. While ADT is "tunable," the energy cannot be "tuned up" to a level that would immediately cause permanent damage to human subjects."

Note these weapons can be 'tuned up.'

D.   The Department of Justice

86.      According to the Congressional Report "Satellite Surveillance, Domestic Issues," dated January 13, 2011, the Intelligence Community viewed law enforcement as a major risk to their

methods and sources and found they focus on criminal activity post event, rather than preventing

an event.  This attitude of the intelligence agencies likely influenced law enforcement and caused

the push to predict and prevent.  Several times, I saw a white pick-up truck in my work parking

lot with lettering "predict and prevent."   One of the frequencies being used on me was

identified as belonging to Defendant "DIGITALGLOBE," MAXAR SATELLITE

TECHNOLOGIES "GEO EYE" who purchased "predictive analytic software" SPADAC" and

hired Dr. Colleen McLaughlin McCue as program manager supporting the company's work

with the Department of Homeland Security.  According to the SPADAC website; "Dr. McCue

is an internationally recognized expert credited with pioneering the application of predictive

analytics to crime analysis and violence prevention in law enforcement settings.   It appears

this has been in the works for a while.  Attached hereto as **Exhibit V** is a true and correct copy

of the SPADAC article regarding Dr. McCue.

87.     Another signal at 144 MHZ was identified as belonging to the Department of Justice

which was initially registered by the FCC to Pennsylvania State University, where the Marine

Corp Research University is co-located and which is the subject of the 2001 National Defense

Authorization Act (NDAA).  The 2001 NDAA required the DOD to work with the DOJ to

review spectrum in the 138-144 MHZ range for reallocation for commercial use to which the

Department of Justice objected saying:

"The loss of spectrum in the 138-144 MHz band could also affect agencies
that are attempting to develop sharing arrangements with public safety
organizations to include DOJ and Treasury. There is a potential for this
band to be used in the development of state-wide and regional shared
public-safety telecommunication systems for joint Federal, state, and local
public-safety agencies. The DOJ and Treasury maintain that the

> reallocation of this band for commercial services is contrary to their position of supporting public safety interoperability and the implementation of a seamless communications system for use by Federal, state, and local public safety officials."

Attached hereto as **Exhibit W** is a true and correct copy of the 2001 National Defense Authorization Act, Reallocation Plan discussing the frequency at 144 MHZ." The 144 MHZ remained for federal use and for "electronic warfare." Electronic Warfare includes the use of directed energy also called "radio frequency weapons." The signal was detected during the testing of Plaintiff's body and later confirmed as being licensed to the DOJ and DOD.

88.    Defendants were going to need more radio frequency spectrum, especially in broadband. To accomplish this, former President Obama issued the "2012 Spectrum Act" which required a certain amount of spectrum to be reallocated or redistributed over a 10-year period for commercial vendors. According to the National Telecommunications Information Administration (NTIA) website, the spectrum in the 1755-1780 MHZ, 1695-1710 MHZ and 2155-2180 MHZ appears to be sold and/or is being shared with "Screened Images, d/b/a/ "Corrections.com," who has the "appearance" of being a commercial wireless vendor but as stated previously are DOD contractors and "military scientists" who operate another company called "BINJ Laboratories." This group also boasts of their knowledge in "radio frequency identification devices." Attached hereto as **Exhibit Y is** a true and correct copy of the FCC license for 1755-1780; 1695-1710 MHZ, and 2155-2180 MHZ, showing Screened Images " Corrections.com" is the license holder. Attached hereto as **Exhibit Z** is a true and correct copy of the main webpage for BINJ laboratories taken from www.binjlabs.com and page showing Joseph Noonan is the CEO of BINJ Laboratories as well as the CEO for "Screened

Images, Corrections.com."

89.     Plaintiff also found, on the FCC website for this particular auction of the broadband

spectrum, the DOD instructions for vacating the spectrum they were giving up.  As a notice to

the prospective buyer, the DOD created a list of locations that their employees were still using

and emitting frequencies so as to not interfere or cross signals.  The spreadsheet included a list

of locations by latitude and longitude.  The list was sorted by state and gave an estimated date

that each location would be cleared for use.  It was a 5-year plan.  There were thousands of

locations coast to coast.  Plaintiff looked many of them up by latitude and longitude and found

they were homes in residential areas where DOD operators were using "EIRP" defined as

"Effective Isotropic Radiated Power," synonymous with equivalent radiated power, which is an

IEEE standardized definition of **directional radio frequency power**, such as that emitted by a

radio transmitter."  Or put another way, "directed radio frequency" power.  Attached hereto as

**Exhibit A1** is a true and correct copy of some of these spreadsheets, as an example.  Plaintiff

believes the DOJ is planning to make changes to the prison system to relieve overcrowding

issues by electronically incarcerating inmates in their own homes which would require devices

placed about the inmate's home which can be used to electronically incarcerate.

90.     Plaintiff has experienced being "shot" with radio frequency weapons numerous times

whenever she goes outdoors.  Defendants are testing the radio frequency weapons system that was

able to hit Plaintiff with apparent pin point accuracy from afar.  Field testing includes shooting

Plaintiff even while driving.  Plaintiff was followed and shot in the feet by a couple of young men

in a white van with the license plate 'HOTSHOE' and another blacked-out SUV with the license

plate "KEEP PACN" or other form of the words "keep pacing."   Plaintiff also noticed the

presence of large Mercedes vans while being hit with these weapons.  When it reached the

point that Plaintiff reasoned she could no longer could call it 'coincidence' Plaintiff did some

research on these vans for use by law enforcement and found an advertisement calling these

vans "MOBILE ELECTRONIC WARFARE LABORATORIES."  Below is an excerpt from

"Mobile Concepts" taken from a public website:

> "This industry-leading Mobile Electronic Warfare Laboratory (MEWL) was
> picked up at our facility by the Naval Air Systems Command (NAVAIR).
> NAVAIR has military and civilian personnel stationed at eight locations across
> the continental United States and one site overseas. Their mission is to provide
> full life-cycle support of naval aviation aircraft, weapons, and systems operated
> by Sailors and Marines."
>
> "This top of the line 2017 Mercedes-Benz Sprinter 3500 4x4 was upfitted to
> include three workstations prewired for CAT6 & 110V and a bonus fold-down
> 4th work area.  Additional features include 6 exterior LED scene lights, a
> wireless remote-controlled pan/tilt spotlight on the roof, 19" wide equipment
> rack, and Onan 8kW diesel generator. "
>
> "After inspection of the unit to ensure the highest quality standards the agency
> was provided an in-depth standard operational training on the MEWL-4WS so
> that it can be utilized as a fully functional radio frequency laboratory for field
> and range testing."

Attached hereto as **Exhibit B1** is a true and correct copy of the advertisement taken from

"Mobile Concepts.com."

E.  The "Belligerents" and the "High-Value Detainee Interrogation Group"

91.    It is **CRITICAL** to note in the same NATO document (Ex. T ), Section 6.9 "HUMAN

EFFECTS ISSUES AFFECTING NLW DEVELOPMENT, TESTING AND ACCEPTANCE;

PUBLIC AND POLITICAL ATTITUDES AND EXPECTATIONS," clearly indicates that the

testing of these directed energy weapons were going to be carried out on people referred to as

the "Belligerents." Section 6.9 states in pertinent part:

"Acceptability: After ensuring the legality of a weapon's development and
use, it is important to address other elements of public awareness and
acceptability. "**BELLIGERENTS**" may exploit perceived inadequacies,
whether these are true or not, in the safety of the NLT system. Unacceptable
facts or publicity can affect the public, politicians and the military user and
quite possibly can affect the success of the mission. It is thus important to
have effective testing of the system prior to deployment coupler with
appropriate ROE and training. Security considerations may affect the types
of information that can be made available for the sake of public information
prior to a weapon's deployment. Policies will ultimately have to account for
all elements of public awareness and acceptability."

A true and correct copy of the NATO document naming the "Belligerents" as the test bed for

directed energy (radiation) weapons is attached hereto as **Exhibit C1**.    In 2010,  John McCain

and Joe Lieberman tried to pass the "Enemy **Belligerent** Interrogation, Detention, and

Prosecution Act."  The bill would have authorized the President to establish the "High-Value

Detainee Interrogation Group" consisting of executive branch personnel with expertise in

terrorism and interrogation.  The Bill did not pass but the language from the Bill was rolled

into the 2012 National Defense Authorization Act which states in pertinent part:

"Subtitle D — Counterterrorism

SEC. 1021. AFFIRMATION OF AUTHORITY OF THE ARMED FORCES OF THE UNITED STATES TO DETAIN COVERED PERSONS PURSUANT TO THE AUTHORIZATION FOR USE OF MILITARY FORCE.

(a) IN GENERAL. — Congress affirms that the authority of the President to use all necessary and appropriate force pursuant to the Authorization for Use of Military Force (Public Law 107–40; 50 U.S.C. 1541 note) includes the authority for the Armed Forces of the United States to detain covered persons (as defined in subsection (b)) pending disposition under the law of war.

(b) COVERED PERSONS. — A covered person under this section is any person as follows:

(1) A person who planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored those responsible for those attacks.

(2) A person who was a part of or substantially supported al-Qaeda, the Taliban, or associated forces that are engaged in hostilities against the United States or its coalition partners, including any person who has committed **a belligerent act** or has directly supported such hostilities in aid of such enemy forces.

(c) DISPOSITION UNDER LAW OF WAR. — The disposition of a person under the law of war as described in subsection (a) may include the following:

(1) Detention under the law of war without trial until the end of the hostilities authorized by the Authorization for Use of Military Force.

The "High-Value Detainee Interrogation Group (HIG)" was established. This group decides who qualifies as a "Belligerent," who then become "unprivileged" allowing the United States Military to use all necessary and appropriate force pursuant to the Authorization for Use of Military Force (Public Law 107–40; 50 U.S.C. 1541 note) including the authority to detain covered persons pending disposition under the law of war.  Recall, however, that the higher,

overarching purpose for the "Belligerents" as shown in the NATO document  (Ex. T ), is for

use as test subjects for directed energy (radiation) weapons.

92.      Ultimately, the "belligerents" that are being used for directed energy/radio frequency

(radiation) weapons testing are United States citizens that were labeled as a "high-value

domestic terrorist" by the FBI, ratified by the DOD and CIA, and blessed by the DOJ for use as

military fodder.   Plaintiff is preparing a Motion for Judicial Review of the 2013 Watchlisting

Guidance Document, for illegal agency action, pursuant to the Administrative Procedures Act.

VII.  INTENTONAL CONCEALMENT

A.  The Contraband Cell Phone Program

93.      Plaintiff believes this experimental program was designed first for use on prisoners and

cleverly hidden within the "Contraband Cell Phone Program" and also designed to use on

American Citizens to electronically incarcerate a person in his/her home instead of an

institution.  To follow is a timeline of the progression and development of the contraband cell

phone issue

94.      In 2009, the Department of Homeland Security approached Congress asking for help in

curbing "contraband cell phones" reportedly being smuggled into prisons at an alarming rate.

That same year, Secretary Janet Napolitano had been pressured by the ACLU to end its

"National Applications Office (NAO)" which was created to share satellite imagery with DHS

and law enforcement for surveillance.  The ACLU said satellite surveillance was an invasion of

American's privacy rights.  The DHS agreed and took down the NAO satellite surveillance

program, but immediately began developing the "contraband cell phone program" and funded a

study by the "California Council on Science and Technology" which convened a group of

overly qualified scientists that included eight members from NASA, including the Director of

the NASA Ames Center, that supports a fleet of satellites, a "plasma physicist" and the father of "smart dust."

95.     In 2010, the FCC Public Safety and Homeland Security Bureau worked with the National Institute of Justice and the Association of State Correctional Administrators, also to discuss options.

96.     In 2011, CDCR launched a pilot project for a "Managed Access" program in two prisons which essentially blocks unauthorized calls using a company called "ShawnTech Communications."

97.     In 2012, the "California Council on Science and Technology" (CCST) released its report after having gathered together a group of experts, all with backgrounds in either creating nanomaterials, biomedical devices, plasma physics for the delivery of the radiation, etc., semiconductors, including the type of devices that had been implanted in my body or the needed expertise in creating the sophisticated wireless radio frequency network systems for connecting to the implanted persons, including by satellite.  The list includes:

A.     Charles Harper, Senior Vice President, SemTech, developers of wireless RF products including gateways, transceivers, receivers, transmitters and semiconductors.

B.     Mim John, CCST Chair, Sandia Laboratorie; Developers of Nanodevices and Microsystems; creates novel nano- and microscale devices, achieves new methods of integration, and novel microsystems-based complex systems.

C.     Patrick Diamond, Plasma Physicist, Consultant & Technical Project Study Team Lead; Plasma Physics, "Pulsed power plasma."

D.     David Goldstein, Sr. Systems Engineer, The Charles Stark Draper Laboratory, Inc.; Nanostructuring applied to the development of implantable medical devices.

E.      Brian W. Carver, Assistant Professor, University of California, Berkeley; Law

Professor, Intellectual Property Law and Cyberlaw

F.      NASA: Pete Worden, Director, NASA Ames Research Center

G.      NASA: Deb Feng, Deputy Center Director

H.      NASA: James Williams, IT Director and ARC Chief Officer

I.      NASA: Bill Notley, ARC RF Spectrum Manager

J.      NASA: Bill Hunt, RF/IT Technician

K.      NASA:  Don Beddell, Network Engineer

L.      NASA:  Ray Gilstrap, Network Engineer, IT Directorate

M.      Peter Cowhey – Professor UC San Diego; Peter Cowhey worked with President Obama

from 2009-2010.  He is a widely recognized trade expert, and a scholar in the field, with

special experience in telecommunications policy.

N.      Karl Pister – UC Chancellor, Professor, Engineering UC Berkeley and father/partner of

Kris Pister, also a Professor at UC Berkeley, the "Father of Smart Dust."

98.      In 2012, the same year that the above referenced report was released, CDCR awarded

the contract to Global Tel Link (GTL) and, according to the FCC Order dated March 2013,

GTL's "Managed Access Operator" received experimental authorization to test a "Managed

Access" system to block cell phones in nine prisons."   The "Managed Access Operator" is not

the company shown on the FCC licenses which is "Screened Images, d/b/a "Corrections.com."

This company appears on the FCC licenses/leases for the "Managed Access" cell phone

program; however, this company denies they are the "Managed Access" contractor and claims

"they only do the video."   This appears to be true.  They have a link that says "GTL" on their

website at "Corrections.com" for inmates and families to visit using video conferencing.

Further, the March 2013 Order shows GTL petitioned the FCC asking if the authorizations to use these frequencies can be for a "correctional facility, a local or state agency, a managed access provider, or some other third party."   GTL also petitioned the FCC asking for authorization to use more than one type of technology to "eradicate the problem."  The problem was highly exaggerated.  There were a lot of phones smuggled in, but mostly because it was too expensive to make a call using their system.

A.  Intentional Concealment; "Screened Images, "Corrections.com"

99.    "Screened Images, Corrections.com" appears on the FCC licenses to manage the access of cell phones at many California prisons, yet they claim they do not work on the cell phone issue at all.  Further, CDCR produced another contract with  Pyramid Technologies for the same purpose.  Screened Images, Corrections,com is actually a Department of Defense contractor staffed by military scientists who travel around in mobile vans, according to the receptionist.  The HIG "contracts with PhD level scientists that also travel around in mobile vans.  The actual company is "BINJ" Laboratories.  It is unknown what "Screened Images, Corrections.com" is actually doing or why their name is on the licenses.  However, Plaintiff did learn that the CEO of "Screened Images, d/b/a/Corrections.com," Joseph Noonan" is related to Laura Noonan, the president of "Screened Images, d/b/a/ SIM (for Screened Images Media.)  On Laura Noonan's website, her company's clients include many federal government agencies and pharmaceutical companies, most notably, the "Anticoagulation Forum".  This is interesting since one of the devices surgically removed from Plaintiff's body contained sea snake venom which is being researched for its novel anticoagulation properties.

B.   Intentional Concealment – Failure to respond to lawful Public Records Act requests and intentional destruction of evidence.

100.    Plaintiff's employer, CDCR/CCHCS, intentionally concealed the identities of some of the persons Plaintiff saw in her work parking lot who, Plaintiff believes were responsible for her injuries and the non-consensual experimentation. CDCR/CCHCS intentionally concealed their identities by destroying video surveillance footage and not responding to Plaintiff's lawful Public Records Act requests.

101.    Plaintiff requested copies of video camera footage on several occasions.  The first request was on March 13, 2017.  A true and correct copy of the first email request dated March 13, 2017 is attached hereto as Exhibit _____.  The request was vetted through the CDCR/CCHCS legal department who determined Plaintiff should file a Public Records Act (PRA) request.  A true and correct copy of the email response from Janet Lewis, Deputy Director, dated April 17, 2017, indicating Plaintiff could view the video footage upon filing a Public Records Act request is attached hereto as Exhibit__Plaintiff was questioned by Janet Lewis, Lara Saich and Christopher Gates asking her why she wanted to view it and what she expected to see.  A true and correct copy of the email from Christopher Gates asking Plaintiff for the date, time and description of the incident/person Plaintiff was looking for in the video is attached hereto as Exhibit _____.  Plaintiff was also asked the same thing by her manager, Lara Saich.  Plaintiff told Lara Saich she needed the video showing a red Mercedes driven by former CIA member.   Plaintiff also responded to the same question from Janet Lewis.  By the time Plaintiff was able to view the video, she had described exactly what she was looking for, which was deleted prior to her viewing it.   According to his emails,  Christopher Gates had access to the cameras and is the person who "pulled" the video. (Refer to Exhibit _ wherein Gates tells Plaintiff he has access to the cameras and can only pull the video if he has justification.).
Plaintiff explained to Gates that on the morning in question,  a former CIA member was

heading towards her in her work parking lot after she had gotten out of her car and was walking towards the entrance.  The video would have clearly shown the person of interest's face and the license plate of the car.  The video clip was altered to end at the precise moment when the former CIA employee's face and license plate would have come into view, and it picked back up after the car had rounded the corner and was leaving the lot which was too far away to identify the driver or see the license plate.  It had been intentionally deleted.  The employee, Christopher Gates, who had pulled the video appeared a little nervous and turned his head to the left where Plaintiff was seated and stated: "oh, the cameras must be motion controlled."  Plaintiff noticed Gates' hands were visibly shaking.  Plaintiff pointed out to Gates the other cars that were passing by without "disappearing" like the red Mercedes did.  Gates appeared to be getting angry and admitted the cameras were not motion controlled.  Gates turned his back Plaintiff indicating the session was over.  Gates later wrote a highly inflammatory letter about plaintiff in an effort to clear him from wrongdoing by stating that Plaintiff was "mentally unstable and paranoid," and that he was so shaken from the video-viewing event that he had to be off of work for two (2) days afterwards.  Gates was visibly shaking while showing Plaintiff the altered video, but not because of Plaintiff's behavior.  In his letter, Gates also states that he fears for his wife who works with Plaintiff.  Plaintiff did not have any meaningful interactions with Gates' wife, Sara.  What is interesting is that Gates' wife, Sara was promoted very quickly to the Chief over the INMATE APPEALS BRANCH.  Plaintiff never had much interaction with Chris Gates prior to this and purposefully avoided him during the only times she might ever see him which was at breaktimes, outside.  Plaintiff purposefully avoided Gates because he was a heavy smoker.

102.   Plaintiff made a second request on October 31, 2017, for nine (9) other dates and times.

The response to the second request was that there was a "technical malfunction."   A true and correct copy of the email response to the second PRA request saying there was a "technical malfunction" is attached hereto as Exhibit.

103.     Plaintiff made a third request on November 20, 2017,  for eight (8) dates and times to which CDCR/CCHCS did not respond.   The response stated "you were advised the *previous* dates for the *prior* request were not available."   In other words, the response simply restated the response to the second request. CDCR/CCHCS never responded to Plaintiff's  November 20, 2017 lawful request.  It should be noted that CDCR/CCHCS did respond to one date, in particular, saying that Plaintiff could have the video footage from November 9, 2017, which is Plaintiff's birthday.  A true and correct copy of the email dated December 12, 2017 is attached hereto as Exhibit ____.

104.     Plaintiff made a fourth request on December 14, 2017, which was another individual Plaintiff believed to also be CIA related who had been following her driving a bronze 4-door older model sedan type car, California license plate "FBD860" to which Plaintiff's employer simply responded saying they could not allow her to view the footage because "it might reveal vulnerabilities in an information technology system and is a public safety issue."  This last response was after she was told the system was defunct for over a 10-month stretch, so public safety hardly seemed a priority.  Further, Plaintiff had already been told she could request the videos pursuant to the Public Records Act since it was a public parking lot. A true and correct copy of the fourth PRA request dated December 14, 2017 is attached hereto as **Exhibit** V.  A true and correct copy of the email response dated December 18, 2017 is attached hereto as **Exhibit W**.  Plaintiff's  requests spanned over a 10-month period at varying dates and times for a total of 18 separate requests.  Of these 18 requests, one (1) had been tampered with, one (1)

was denied, and 16 coincidentally fell on dates and times wherein the video system supposedly

"malfunctioned." The request from November 20, 2017 was not responded to at all.

Ultimately, CDCR/CCHCS failed to respond to 18 lawful PRA requests that were authorized

by Plaintiff's employer on April 17, 2017, after receiving a legal opinion authorizing it. Refer

to Exhibit __

105.    This resulted in Plaintiff not being able to show the vehicles at issue in her work

parking lot which included a black charger license plate 5IGI386, the truck with the "5150

WHL" license plate, a white Ford truck with Virginia plates and lettering on its side saying

"Pattern, Predict, Prevent," and a white Nissan with Virginia License Plate NTR99.

C.  Intentional Concealment: Failure to Perform Regulatory Duty; Cal-OSHA

106.    Plaintiff filed a complaint with Cal-Osha regarding toxic exposures and requested an

immediate inspection of her workplace.  On September 16, 2017,  Plaintiff received a letter

from her employer, telling her what her options were for Family Medical Leave Act (FMLA)

provisions.

107.    On September 20, 2017, Plaintiff received a letter from the CDCR Disability Unit

saying they intended to have Plaintiff evaluated.  Plaintiff thought it was the required medical

evaluation and testing for overexposure to radiation as required by regulation and cited in her

complaint to Cal OSHA.  Further, Dr. Hildegarde Staninger, Ph.D., RIET-1, personally made a

report to Cal OSHA, on Plaintiff's  behalf, citing the regulatory requirements.  Dr. Staninger is

an OSHA graduate, Doctor of Toxicology, and nationally recognized as an authority in the

field of  Industrial Toxicology by academia and federal and state regulatory agencies in that

she quite literally 'wrote the book' on "The Comprehensive Handbook of Hazardous Materials,

Safety, Monitoring, and Regulations" which is the university required text for the Industrial

Hygienist Environmental Health Degree/Training Programs, and the reference text used by the United States Department of Labor, Occupational Safety and Health Administration for their new "1910.1200 Hazard Communication Standard for Identification of Hazardous Chemicals for Small Businesses."

108.    On September 22, 2017, Plaintiff met with staff in the CDCR Disability Unit to learn about the fitness for duty evaluation at which time she learned it was for psychiatric evaluation, rather than the required medical evaluation.  It was highly insulting.

109.    On October 2, 2017, Plaintiff turned in her FMLA paperwork and was approved for FMLA on October 5, 2017.  The approval was through December 31, 2017 and was extended at that time.

110.    On October 2, 2017, Plaintiff provided CDCR with a copy of a letter to Cal OSHA from Dr. Staninger®, RIET-1, to Cal OSHA which states in pertinent part: ….

"It is imperative that a request for OSHA inspection be scheduled as soon as possible to evaluate Ms. DeVore's workplace exposure to EMF, RF and non-ionization sources of energies, since they could travel through her body and become immediate concern for health and safety as well as life threatening exposure to specific areas of her body where semiconductors have been identified in her body by AAA security."

111.    On October 14, 2017, Plaintiff received the formal Fitness for Duty letter which threatened dismissal if she did not attend.  Plaintiff was told if her FMLA was certified also by a "Psychiatrist" then the fitness for duty would not be needed. Plaintiff's FMLA was certified by a medical doctor and psychiatrist.  Plaintiff sought legal counsel regarding

CDCR's demand for fitness for duty evaluation in violation of Protected Leave of Family Medical Leave Act ("FMLA") and Illegal Retaliation for Cal/ OSHA Whistleblower Status - CA Labor Law §1102.8(a).  Plaintiff felt her employer was trying to discredit her by scheduling her for a psychological evaluation.  On October 25, 2017, Plaintiff sent a letter to her employer regarding constructive medical suspension in bad faith in Violation of California Government Code § 19253.5(i)(1)".

112.    Dr. Staninger reached out to federal OSHA and wrote four more times in an effort to help Plaintiff, to no avail.  Copies of the letters from Dr. Staninger on behalf of Plaintiff dated 10-2-17; 11-6-17; 10-25-17; 11-7-17 and 10-30-17 are attached hereto as Exhibit ___

## VII  STATE'S SECRETS PRIVILEGE

113.    There are no privileged or classified secret documents included in this filing or contemplated for discovery at this time .  Moreover, the United States Court of Appeals for the Ninth Circuit ruled that the state's secrets privilege, which the United States Government has used to seek dismissal of cases involving secret government conduct, does not compel dismissal of a case at the outset solely because it involves government secrets.  It further ruled that the privilege prevents disclosure of secret evidence but does not prevent litigation concerning secret programs using non-secret information.   In the matter of Mohamed v. Jeppesen Dataplan, Inc., No. 06-1613 (9th Cir. Apr. 28, 2009), several plaintiffs filed a lawsuit in federal district court alleging they had been apprehended and detained under an "extraordinary rendition program" operated by the Central Intelligence Agency (CIA), resulting in psychological and physical abuse. The plaintiffs sued Jeppesen Dataplan, Inc., a government contractor that provided support to the CIA program. The U.S. Government intervened in the lawsuit and filed a motion to dismiss, claiming that because the case involved

secret government activities, it should be dismissed under the state secrets privilege. The district court granted the government's motion.  In reversing, the Ninth Circuit held that the state secrets privilege requires only that secret evidence be kept out of a case but does not require dismissal of a case involving secret programs. It ruled that the privilege prevents disclosure of secret evidence but does not prevent litigation concerning secret programs using non-secret information. The court also ruled that the fact that the Executive Branch deems information classified may indicate it should be considered secret for litigation purposes, but the final determination over what may be presented at trial is a matter for the judiciary to decide. The court emphasized that "[s]eparation-of-powers concerns take on an especially important role in the context of secret Executive conduct.  It remanded the case to the district court to allow the litigation to proceed.

## VIII.  DISCRETIONARY FUNCTION EXCEPTION

A.  <u>Congress relinquished sovereign immunity for non-consensual radiation experiments.</u>

114.    "No Action Lies Against the United States unless the Legislature has Authorized it."  In the case of non-consensual radiation experiments on unwitting participants, the Legislature not only authorized action against the federal government, ***they brought the action themselves.***  One need only look at Public Law 101-426, the "Radiation Exposure Compensation Act" and the report issued by the Executive Branch "Advisory Committee on Human Radiation Experimentation" to see Congressional condemnation of nonconsensual radiation experiments on unwitting participants and the Legislature's intent to hold the government accountable for such actions. In the RECA, Congress specifically calls out the federal government and declared the United States should assume responsibility for the harm it caused:



"the United States should recognize and assume responsibility for the harm done to these individuals."

115.   This is further supported and made relevant to this matter by the Executive Branch "Advisory Committee on Human Research and Experimentation" who spoke of preventing future occurrences:

"It is equally important that, the historical record having been spelled out and appropriate remedies identified, we as a nation move forward and take action to prevent similar occurrences from happening in the future, and

".....it was a time of arrogance and paternalism on the part of government officials and the biomedical community that we would not under any circumstances wish to see repeated."

116.   In Dalehite v. United States, the Supreme Court looked to the Congressional Committee hearings for guidance before applying the discretionary  function exception and conducted an analysis of the historical  precedent of the  Federal Tort Claims Act to determine the meaning of "discretionary function" and issued its precedent decision which is "no action lies against the United States unless the Legislature  has authorized  it." Prior to Dalehite, the Supreme Court's decisions had interpreted the Act to require clear relinquishment of sovereign immunity to give jurisdiction for tort actions.

117.   The definition of discretionary function beyond this created challenges over the years. The Supreme Court relied upon the planning/operational distinction for about 3 decades but

returned, in part, to the original interpretation where the controlling inquiry is again

Congressional intent.   In *Varig Airlines,* 467 U.S. at 813, the Court adopted a new test.   The

first prong of the new test became "whether the challenged acts of a Government employee are

of the nature and quality **that Congress intended to shield from tort liability**."   The second

prong was whether the discretionary act was grounded in social, economic, or political policy,

and was therefore protected by the discretionary function exception in order to prevent judicial

"second-guessing" of legislative and administrative decisions.   The court also cautioned that

"matters of scientific and professional judgment-particularly judgments concerning safety-

are rarely considered to be susceptible to social, economic, or political policy."   Stated another

way, once the Government has undertaken responsibility for the safety of an event, the

execution of that responsibility is not subject to the discretionary function exception.   Marlys

Bear Medicine v. U.S. ex rel. Secretary of Dept. of Interior, 241 F.3d 1208, 1215 (9th Cir.

2001).

B.   Violations of Clear Statutory Duty; Failure to Obtain Informed Consent

118.   The Discretionary Function Exception fails when there are clear violations of

statutory duty.   Defendants violated Department of Defense Instruction 3216.02;

"Protection of Human Subjects and Adherence to Ethical Standards in DOD-Supported

Research."   These experiments are listed as "DOD Supported Research."   A true and

correct copy of the document "Additional DOD Supported Research - Radiation Health

Effects" is attached hereto as **Exhibit D1**.   The stated purpose of DOD Directive 3216.02 is

"to establish policy and assign responsibilities for the protection of human subjects in DoD-

supported programs to implement part 219 of Title 32, Code of Federal Regulations, also

known as "the Common Rule."   Specific violations are as follows:

- **3216.02.4a.** "All research involving human subjects that is conducted or supported by the Department of Defense shall comply with Title 32, Part 219 (Common Rule).

- **3216.02.4d.** "DoD-appropriated funds shall not be used to support research involving a human being as an experimental subject, as defined in this Instruction, without the prior informed consent of the experimental subject or in accordance with section 980 of Title 10, U.S.C.'  The definition of "Research involving a human being as an experimental subject" is "An activity, for research purposes, where there is an intervention or interaction with a living individual for the primary purpose of obtaining data regarding the effect of the intervention or interaction. Research involving a human being as an experimental subject is a subset of research involving human subjects. This definition relates only to the application of section 980 of U.S.C. Title 10;

- **3216.02.4e.** "Research involving human subjects covered under this Instruction shall also comply with applicable Federal and State laws and regulations.  In the event of a conflict between the two, the most protective of the human subjects shall apply."

119.    There is clear and compelling evidence that the Legislature did not intend to shield the federal government from liability related to conducting nonconsensual radiation experiments on unwitting participants.  Further, the Discretionary Function exception would not bar this claim since the DOD clearly violated its own policies and federal regulations related to requirements for informed consent.

120.    Ultimately, this case passes the most rigid of tests to determine whether the exception should apply which is the clear relinquishment of sovereign immunity to give jurisdiction for tort actions related to non-consensual radiation experiments on unwitting participants. Congress made its intention clear in this regard.

## IX. ALLEGATIONS

COUNT I:

NON-CONSENSUAL HUMAN EXPERIMENTATION

Plaintiff includes herein by reference all allegations set forth in the preceding paragraphs.


121.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the furtherance of NASA space exploration experiments regarding the human effects of space radiation beginning on or about September 1, 2016, to present.  Attached hereto as **Exhibit** is a true and correct copy of the NASA research project "Human Effects Projects, Space Radiation."

122.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the furtherance of Defense weapons, including the Air Force Research Laboratory "Radio Sensitizing Effects of Non-Ionizing Directed Energy" beginning on or about September 1, 2016, to present.  Attached hereto as **Exhibit** is a true and correct copy of the "Radio Sensitizing Effects of Non-Ionizing Directed Energy" research project.

123.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the furtherance of Defense weapons, including the Air Force Research Laboratory project: "Impact of Short Pulse Electromagnetic Fields on Mamallian Cells," beginning on or about September 1, 2016, to present.  Attached hereto as **Exhibit** is a true and correct copy of "Impact of Short Pulse Electromagnetic Field on Mamallian Cellst" research project."

124.    Plaintiff alleges 365 separate instances of wrongdoing by which Plaintiff was damaged in the furtherance of Defense weapons, including the Air Force Research Laboratory project: "Biological Effects associated with Terahertz Radiation" beginning on or about September 1,

2017 to present.  Attached hereto as **Exhibit**   is a true and correct copy of the "Biological

Effects associated with Terahertz Radiation" research project.

125.     Plaintiff alleges 365 separate instances of wrongdoing by which Plaintiff was damaged

in the furtherance of Defense weapons, including the Air Force Research Laboratory project:

"Risk Assessment and Bioeffects of Very High Flux Electron Beam,"  beginning on or about

September 1, 2017.  Attached hereto as Exhibit _  is a true and correct copy of the "Risk

Assessment and Bioeffects of Very High Flux Electron Beam" research project.  Plaintiff

alleges 365 separate instances of wrongdoing by which Plaintiff was damaged in the

furtherance of Defense weapons, including the Army research project: "Understanding the

Biological Effects of exposure to and building a threshold for directed energy to laser,

microwave and radiofrequency waves ," beginning on or about September 1, 2017.  Attached

hereto as Exhibit  is a true and correct copy of the research project "Understanding the

Biological Effects of exposure to and building a threshold for directed energy to laser,

microwave and radiofrequency waves" research project.

126.     Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged

in the furtherance of Defense weapons, including the Air Force Research Laboratory project:

"AKELA See Through the Wall Radar," beginning September 1, 2016 to present.  Attached

hereto as Exhibit __  is a true and correct copy of the AKELA See Through the Wall Radar"

research project.

127.     Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged

in the furtherance of the United States Army Research Project re "Sleep Loss Resilience,"

beginning September 1, 2016 to present.  Attached hereto as Exhibit __  is a true and correct

copy of the "Army Sleep Loss Resilience" research project.

128.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the furtherance of Defense cancer research for the "Mesothelioma, Early Detection" research project, beginning September 1, 2016 to present.  Attached hereto as **Exhibit** is a true and correct copy of the "Mesothelioma, Early Detection" Defense research project.

129.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the furtherance of the United States Army Research Project re "Pain Management," beginning on or about September 1, 2016.  Attached hereto as Exhibit is a true and correct copy of the "Army Research Project re Pain Management."

130.    California Health and Safety Codes §24170-24179.5; Ch. 1.3., Human Experimentation, established the "Protection of Human Subjects Experimentation Act" which requires informed consent and provides statutory protection for Californians with regard to human experimentation and also provides penalties for those who violate those provisions. Section § 24175 explicitly provides: "No person shall be subjected to any medical experiment unless the informed consent of such person is obtained."  Further, Title 32, Part 219 (Common Rule) 3216.02.4e provides "Research involving human subjects covered under this Instruction shall also comply with applicable Federal and State laws and regulations.  In the event of a conflict between the two, the most protective of the human subjects shall apply."

131.    Due to the outrageous conduct of Defendants causing Plaintiff to suffer nonconsensual radiation experiments for at least two (2) years, Plaintiff is entitled to recover damages proximately caused thereby in an amount of  $25 million dollars or amount approved by the conscience of an enlightened and informed jury.

COUNT II

INVOLUNTARY SERVITUDE

Plaintiff includes herein by reference all allegations set forth in the preceding paragraphs.

132.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in the furtherance of NASA space exploration experiments regarding the human effect of space radiation beginning on or about September 1, 2016, to present.  Attached hereto as **Exhibit** is a true and correct copy of the NASA research project "Human Effects Projects, Space Radiation."

133.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in furtherance of Defense weapons, including the Air Force Research Laboratory "Radio Sensitizing Effects of Non-Ionizing Directed Energy" beginning on or about September 1, 2016, to present.  Attached hereto as **Exhibit** is a true and correct copy of the "Radio Sensitizing Effects of Non-Ionizing Directed Energy" research project.

134.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in furtherance of Defense weapons, including the Air Force Research Laboratory project: "Impact of Short Pulse Electromagnetic Fields on Mamallian Cells," beginning on or about September 1, 2016, to present.  Attached hereto as **Exhibit** is a true and correct copy of "Impact of Short Pulse Electromagnetic Field on Mamallian Cellst" research project."

135.    Plaintiff alleges 365 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in furtherance of Defense weapons, including the Air Force Research Laboratory project: "Biological Effects associated with Terahertz Radiation" beginning on or about September 1, 2017 to present.  Attached hereto as **Exhibit**

__ is a true and correct copy of the "Biological Effects associated with Terahertz Radiation" research project.

136.    Plaintiff alleges 365 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in furtherance of Defense weapons, including the Air Force Research Laboratory project: "Risk Assessment and Bioeffects of Very High Flux Electron Beam," beginning on or about September 1, 2017.  Attached hereto as Exhibit _ is a true and correct copy of the "Risk Assessment and Bioeffects of Very High Flux Electron Beam" research project.

137.    Plaintiff alleges 365 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in furtherance of Defense weapons, including the Army research project: "Understanding the Biological Effects of exposure to and building a threshold for directed energy to laser, microwave and radiofrequency waves ," beginning on or about September 1, 2017.  Attached hereto as Exhibit  is a true and correct copy of the research project "Understanding the Biological Effects of exposure to and building a threshold for directed energy to laser, microwave and radiofrequency waves" research project.

138.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in furtherance of Defense weapons, including the Air Force Research Laboratory project: "AKELA See Through the Wall Radar," beginning September 1, 2016 to present.  Attached hereto as Exhibit __ is a true and correct copy of the AKELA See Through the Wall Radar" research project.

139.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged in the hostile and forced involuntary service in furtherance of the United States Army Research

Project re "Sleep Loss Resilience," beginning September 1, 2016 to present.  Attached hereto

as Exhibit ___ is a true and correct copy of the "Army Sleep Loss Resilience" research project.

140.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged

in the hostile and forced involuntary service in furtherance of Defense cancer research for the

"Mesothelioma, Early Detection" research project, beginning September 1, 2016 to present.

Attached hereto as **Exhibit** is a true and correct copy of the "Mesothelioma, Early Detection"

Defense research project.

141.    Plaintiff alleges 730 separate instances of wrongdoing by which Plaintiff was damaged

in the hostile and forced involuntary service in furtherance of the United States Army Research

Project re "Pain Management," beginning on or about September 1, 2016.  Attached hereto as

Exhibit is a true and correct copy of the "Army Research Project re Pain Management."

142.    Due to the outrageous conduct of Defendants causing plaintif to suffer Involuntary

Servitude for at least two (2) years, Plaintiff is entitled to recover damages proximately caused

thereby in an amount of  $25 million dollars or amount approved by the conscience of an

enlightened and informed jury.

COUNT III

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff includes herein by reference all allegations set forth in the preceding paragraphs.


143.    Defendants attacked Plaintiff's entire family, including Plaintiff's two adult children

and three grandchildren.  Plaintiff was very curious about the anti-epileptic drugs found in one

of the devices surgically removed from her body since it made no sense to give that to someone

not epileptic, until Plaintiff found another experiment by Defendants for "trauma-induced

epileptic seizures." Attached hereto as Exhibit ___ is a true and correct copy of the Epilepsy research experiment.  What has been done to Plaintiff over the past 2+ years was beyond cruel and unimaginable and designed to traumatize Plaintiff.  Plaintiff believes Defendants actually contracted with a military Psy Ops person whom Plaintiff believes to be Defendant Duane Essex with the license plate "5150 WHL" who Plaintiff realized had been following her. When Plaintiff did not go into a trauma-induced epileptic seizure, Plaintiff asserts Defendant Essex went after her children and grandchildren, even if that was not the reason.  Plaintiff was told "we will kill your son if you sue anyone except Kaiser."  Defendants implanted Plaintiff's daughter after this, during a routine plastic surgery and put a particular type of asbestos in Plaintiff's daughter that is guaranteed to give her cancer, and fast, if coupled with a particular polio vaccine.  Plaintiff caught the military surgeon who broke into her daughter's private plastic surgery appointment that day, and Plaintiff was able to photograph the NASA contractor (or employee) who was present during the time of her daughter's surgery.

144.    Plaintiff had her daughter tested by AAA Security as well and learned that ALL of the frequencies attached to Plaintiff's daughter were registered to the Department of Homeland Security, except for one that belonged to a satellite company.  On a related note, it was interesting to see that all of the devices implanted in Plaintiff's daughter were placed on and around her sexual body parts; in her breasts, inner thighs, both buttocks, and on both sides of her pubic bone.  Plaintiff is not aware of how these devices monitoring her daughter's sexual body parts will serve "public safety?" (Public Safety is listed on the FCC license for the frequencies.) After Plaintiff's daughter healed from her surgery, she started being followed around by a Department of Homeland Security contractor with the license plate "TRACKNU."

Plaintiff looked it up on Search Quarry and found the person below who appears to be a

Homeland Security contractor:

 



145.    Defendants shot both of Plaintiff's grandchildren, ages 3 and 8, in "drive-by" fashion

with some type of directed energy weapons, while they were playing in the front yard.  Later

that week, Plaintiff was again told "I mean it, I'll kill him."   Plaintiff does not know if the

assassin was referring to Plaintiff's son at this point, or Plaintiff's grandson.  These are just a

few examples of intentionally inflicted emotional distress. Added to this, Plaintiff is now living

with a death sentence hanging over her head, and fear of cancer, not only for herself, but more

for Plaintiff's daughter who has two (2) young children.   Plaintiff is also living in fear for her

life and the lives of her family members, based on death threats.

146.    Plaintiff receives death threats via text messages that immediately disappear after she

reads them. The most recent message stated: "Kill them both at the same time."   Plaintiff is

not sure who the assassins were speaking of besides herself.

147.    Plaintiff was also experiencing other forms of harassment and began working with a

trauma specialist during this time, Dr. Benjamin Colodzin, Ph.D., who stated about Plaintiff in

his report:

> Given the validated presence of such technological devices and monitoring
> frequencies detectable from her physical form, it is difficult to escape the
> conclusion that Dawn's fantastic-sounding report of her experience is in fact
> quite accurate....." and
> "Her reports include documentation and eyewitness reports and she is
> knowledgeable regarding the infrastructure which regulates such activities.
> It does appear that she has been subjected to directed energy (ionizing
> radiation) influences which she has accurately described as a form of
> torture. She appears to be coping with stressors adequately although her
> continuing exhaustion is problematic. "Her pragmatic approach to
> developing evidence has in fact produced results which confirm a physical
> basis exists that support her claims." Dawn does not appear to be a danger
> to self or others, and her thought processes and general demeanor indicate
> that she is dealing with her unusual situation in a rational manner. Her
> analytics clearly indicate that as she has previously claimed, she is
> experiencing serious environmental impact from a defined and operational
> system capable of targeting directed energy (ionizing radiation) effects."

Added to the intentional infliction of emotional distress, Plaintiff's employer refused to help

Plaintiff and alleged mental illness and attempted to force Plaintiff to attend a psychiatric

evaluation for fitness for duty rather than responding to Plaintiff's physical and medical needs and carrying out the required inspections of Plaintiff's worksite.  Upon learning this, Plaintiff consulted with a psychiatrist, Dr. Rima Laibow, Ph.D., who conducted an evaluation of Plaintiff which states in pertinent part:"



"In summary, Ms. Devore is in no regard mentally, emotionally or psychologically unstable or dysfunctional despite the fact that she is facing serious challenges on several major fronts simultaneously which might be expected to be destabilizing and overwhelming. Her ego strength and coping mechanisms are remarkably intact absent any indication of psychotic, delusional or other aberrant functional states."

Attached hereto as Exhibit ___ is a true and correct copy of the Mental Health Report for Plaintiff, by Dr. Rima E. Laibow, M.D., Ph.D.

148.    Due to the outrageous conduct of Defendants causing Plaintiff to suffer the Intentional Infliction of Emotional Distress for at least two (2) years, Plaintiff is entitled to recover damages proximately caused thereby in an amount of  $50 million dollars or amount approved by the conscience of an enlightened and informed jury.


X.   RELIEF REQUESTED

(Protective Orders; Monetary Compensation; Medical Monitoring)

149.    Independent laboratory examination, diagnostic testing, toxicological risk assessments and specific industrial environmental testing conclusively confirmed that Plaintiff was being used for radiation and radiation-related cancer/disease experiments, among other things, and that Plaintiff's workplace at CDCR/CCHCS was being maintained in a seriously unsafe and

unlawful manner which continued to expose Plaintiff to conditions that caused severe pain, hematologic, cardiac, immune, motor function, and central nervous system illnesses, i.e., anxiety, that increased Plaintiff's risk of cancer by millions of times over normal, even in a population where approximately ¼ of all individuals will develop cancer, which is precisely what Defendants intended to do.  This means that it is certain that the irresponsible actions of Defendants in conducting these radiation experiments and toxic environment of Plaintiff's job has assured that  Plaintiff WILL develop cancer.  The elevated risk of cancer to a virtual certainty is largely due to the cavalier and negligent actions of Plaintiff's employer, including Lara Saich, and Janet Lewis for failure to provide a safe work environment, Cal-OSHA, for failure to conduct required inspections and monitoring of Plaintiff's body, despite numerous, repeated requests, Christopher Gates for destroying evidence and concealing the identities of the perpetrators, and Christine Milne for reckless negligence in overlooking Ms. DeVore's physical complaints that caused a delay in detection and treatment and resulting in Plaintiff's wrongful termination.  Milne actually suggested that because she was incapable of understanding a complex matter, it simply must not be true, and Plaintiff must be crazy instead, even though Milne was provided with a wealth of evidence.  Plaintiff's managers and Milne refused to elevate the matter and Plaintiff was left with Milne's incompetence.  The failures by these individuals precluded Plaintiff from establishing a baseline, prolonged Plaintiff's suffering, and delayed potentially life-saving interventions - precisely what was done to the last group of victims.

A.   Protective Orders

150.    Plaintiff is suffering from *-inter alia-* acute and chronic radiation poisoning, heavy metals poisoning and effects from exposure to other toxic, exotic,  carcinogenic biological

materials which, taken together, shows Plaintiff is being experimented upon and that has already caused damage to Plaintiff's vital organs and systemic disease state in Plaintiff's blood which impacted her body's ability to carry and deliver oxygen throughout. Further tests showed DNA damage, suggesting the presence of cancer. Independent laboratory and diagnostic tests showed the presence of radioactive materials (Uranium), radioactive fallout, and other radioactive decay byproducts, and the presence of arsenic, cyanide, mercury, lead, asbestos, cadmium, bismuth, gadolinium, viruses, e-coli, three (3) different types of snake venoms, nanomaterials, nanorods, anti-epileptic drugs (Plaintiff is not epileptic), cervical cells (Plaintiff has not had a cervix in 20 years since her hysterectomy) and other exotic nanomaterials and substances in her body that are used to induce cancer and, presumably, attempt to cure it. Other of these substances and materials are used to remotely monitor Plaintiff's biological and physiological responses to the radiation experiments. According to scientific and medical experts, these materials, coupled with the constant influx of the electromagnetic radiation from the radio signal transmissions being used to remotely conduct the experiments and remotely monitor Plaintiff's body are the required parameters to initiate cancer. The radio signals used by Defendants to monitor Plaintiff's body continually excite the cells and accelerate the mechanism that produces cancer risks which are currently estimated at millions of times greater because of Plaintiff's exposures.

151.    Unless and until Defendants' unlawful practices as alleged herein are enjoined and restrained by court order, Defendants will continue to cause greater and irreparable injury, including death. Plaintiff seeks immediate protective orders as set forth below:

1. IMMEDIATELY cease ALL experiments and testing being conducted on Plaintiff by any and all government agencies and academia, for any and all purposes, including

international global partners, and their employees, components, contractors, agents, affiliates, whether for profit or not.

2. IMMEDIATELY cease all transmissions directed at Plaintiff, including but not limited to the entire range of the electromagnetic spectrum and any and all particle beams, ion beams, ultra-cold neutron beams, electron guns, plasma beams, microwaves, radar, infrared, gamma rays and any and all remote sensing and monitoring signals, including but not limited to multi-platform radar equipment, atomic force microscope, scanning electron microscope, Biological and Analytical Transmission Electron Microscopes, surveillance equipment and devices and equipment capable of video and video streaming or listening devices and any and all signals that utilize any type of positioning technology used for tracking, including ground based, aerial and satellite based technologies.

B.   Monetary Compensation; General and Special Damages

152.   Plaintiff requests monetary compensation in the amount of $102,048,656.00 for special and general damages, including, but not limited to: past and future lost wages, past medical and related costs including but not limited to: medical, surgical, toxicological, diagnostic, and environmental testing; costs for medical monitoring; legal and related fees; and, damages for pain and suffering including present emotional distress resulting from my fear of contracting a future disease (cancer) proximately caused by Defendant's negligent acts in exposing me to disease-causing agents and substances[5].

C.   Medical Monitoring

_____

[5] See generally Simmons v. Pacor, Inc., 674 A.2d 232 (Pa. 1996)

153.    I was significantly exposed to proven toxic substances, carcinogens, innovative

nanomaterials, ionizing radiation and radioactive materials through the negligent acts of

Defendants.  As a proximate result of such exposures, I suffer present injuries and a 100% risk

of contracting a serious latent disease and further injury, including but not limited to cancer.

The increased risk makes periodic diagnostic medical examinations reasonably necessary.

Monitoring and testing procedures exist that make the early detection and treatment of the

disease or injury possible and beneficial.  In the Supreme Court's decision in Potter v. Firestone

Tire & Rubber Co. (1993) 6 Cal. 4th 965, 863 P.2d 795, the court explained that "in the context

of a toxic exposure action, a claim for medical monitoring seeks to recover the cost of further

periodic medical examinations intended to facilitate early detection and treatment of disease

caused by a exposure to toxic substances." (Id., at pp. 1004-1005.)  It ultimately held that "the

cost of medical monitoring is a compensable item of damages where the proofs demonstrate,

through reliable medical expert testimony, that the need for future monitoring is a reasonably

certain consequence of a toxic exposure and that the recommended monitoring is reasonable.

154.    Moreover, the Occupational Safety and Health Act of 1970 (Public Law 91-596) was

passed to assure safe and healthy working conditions for every working person and to preserve

our human resources. This Act charges the National Institute for Occupational Safety and

Health (NIOSH) with recommending occupational safety and health standards and describing

exposures that are safe for various periods of employment,  including, but not limited to the

exposures at which no worker will suffer diminished health, functional capacity, or life

expectancy because of his or her work experience. NIOSH is the leading federal agency

conducting research and providing guidance on the occupational safety and health implications

and applications of nanotechnology.  Workers are already engaged in processes in which they

may be exposed to materials that never existed before in nature.  According to NIOSH literature:



155.    NIOSH developed a list of hazards for which NIOSH has recommended the use of medical surveillance (monitoring) that includes a significant number of substances and materials found in Plaintiff's body included as Appendix C from the "Current Intelligence Bulletin 60, Interim Guidance for Medical Screening and Hazard Surveillance for Workers Potentially Exposed to Engineered Nanoparticles."  A true and correct copy of the list is attached hereto as **Exhibit O.**   NIOSH also provided the below direction on how to proceed related to current OSHA standards:



156.    A true and correct copy of the "Current Intelligence Bulletin 60; Interim Guidance for Medical Screening and Hazard Surveillance for Workers Potentially Exposed to Engineered Nanoparticles" is attached hereto as **Exhibit N.**

XI.  CONCLUSION

157.    Independent laboratory examination, diagnostic testing, toxicological risk assessments and specific industrial environmental testing conclusively confirmed that Plaintiff was being used for radiation and radiation-related cancer/disease experiments, among other things, and that Plaintiff's workplace at CDCR/CCHCS was being maintained in a seriously unsafe and unlawful manner which continued to expose Plaintiff to conditions that caused severe pain, hematologic, cardiac, immune, motor function, and central nervous system illnesses, i.e., anxiety, that increased Plaintiff's risk of cancer by millions of times over normal, even in a population where approximately ¼ of all individuals will develop cancer, which is precisely what Defendants intended to do.  This means that it is certain that the irresponsible actions of Defendants in conducting these radiation experiments and toxic environment of Plaintiff's job has assured that  Plaintiff WILL develop cancer.  The elevated risk of cancer to a virtual certainty is largely due to the cavalier and negligent actions of my employer, including Lara Saich and Janet Lewis, for failure to provide a safe work environment, Cal-OSHA, for failure to conduct required inspections and monitoring of mPlaintiff's body, despite numerous, repeated requests, Christopher Gates for destroying evidence and concealing the identities of the perpetrators, and Christine Milne for reckless negligence in ignoring and overlooking Ms DeVore's physical complaints that caused a delay in detection and treatment and resulting in Plaintiff's wrongful termination.  Milne actually suggested that because she was incapable of understanding a complex matter, it simply must not be true, and Plaintiff must be crazy instead, even though Milne was provided with a wealth of evidence.  Plaintiff's managers and Milne refused to elevate the matter and Plaintiff was left with Milne's incompetence.  The failures by these individuals precluded Plaintiff from establishing a baseline, prolonged Plaintiff's

suffering, and delayed potentially life-saving interventions - precisely what was done to the last group of victims.

**PRAYER FOR RELIEF, WHEREFORE**, Plaintiff, Dawn DeVore, in light of the foregoing, hereby requests relief, in her favor, against Defendants, jointly and severally, as follows:

1.  The relief prayed for in Count 1 of this Complaint;

2.  The relief prayed for in Count 2 of this Complaint;

3.  The relief prayed for in Count 3 of this Complaint;

4.  Issuance of preliminary and permanent injunctions in favor of the Plaintiff, against Defendants, barring any continuance or resumption of the illegal conduct complained of herein;

5.  Reinstatement to my position as a Staff Services Manager II and lost wages x 2.

6.  All costs and expenses be weighed against Defendant and in favor of Plaintiff;

7.  Such other and further relief as the Court may deem necessary and appropriate in the exercise of substantial justice.

DECLARATION AND VERIFICATION:

I, Dawn DeVore, swear under penalty of perjury that the foregoing assertions of fact set forth in the foregoing Complaint are true and correct to the best of my knowledge.

Signed,                                    Date:

_____          9-13-18